ASSOCIATED GENERAL CONTRACTORS OF CALIFORNIA, INC. *v.* CALIFORNIA STATE COUNCIL OF CARPENTERS ET AL.

No. 81–334. Argued October 5, 1982—Decided February 22, 1983

STEVENS, J., delivered the opinion of the Court in which BURGER, C. J., and BRENNAN, WHITE, BLACKMUN, POWELL, REHNQUIST, and O'CONNOR, JJ., joined. MARSHALL, J., filed a dissenting opinion, *post*, p. 546.

*James P. Watson* argued the cause for petitioner. With him on the briefs was *George M. Cox*.

*Victor J. Van Bourg* argued the cause and filed a brief for respondents.*

JUSTICE STEVENS delivered the opinion of the Court.

This case arises out of a dispute between parties to a multi-employer collective-bargaining agreement. The plaintiff unions allege that, in violation of the antitrust laws, the multi-employer association and its members coerced certain third parties, as well as some of the association's members, to enter into business relationships with nonunion firms. This coercion, according to the complaint, adversely affected the trade of certain unionized firms and thereby restrained the

---

*Briefs of *amici curiae* urging reversal were filed by *Solicitor General Lee, Assistant Attorney General Baxter, Deputy Solicitor General Wallace, Elinor Hadley Stillman, Robert B. Nicholson*, and *Robert J. Wiggers* for the United States; by *Peter G. Nash* for the Associated General Contractors of America, Inc.; and by *Edward B. Miller* and *Stephen A. Bokat* for the Chamber of Commerce of the United States.

*J. Albert Woll, Laurence Gold*, and *George Kaufmann* filed briefs for the American Federation of Labor and Congress of Industrial Organization as *amicus curiae* urging affirmance.

*Kenneth E. Ristau, Jr.*, and *David A. Cathcart* filed a brief for the Pacific Maritime Association as *amicus curiae*.

business activities of the unions. The question presented is whether the complaint sufficiently alleges that the unions have been "injured in [their] business or property by reason of anything forbidden in the antitrust laws" and may therefore recover treble damages under § 4 of the Clayton Act. 38 Stat. 731, 15 U. S. C. § 15. Unlike the majority of the Court of Appeals for the Ninth Circuit, we agree with the District Court's conclusion that the complaint is insufficient.

I

The two named plaintiffs (the Union)—the California State Council of Carpenters and the Carpenters 46 Northern Counties Conference Board—are affiliated with the United Brotherhood of Carpenters and Joiners of America, AFL–CIO. The Union represents more than 50,000 individuals employed by the defendants in the carpentry, drywall, piledriving, and related industries throughout the State of California. The Union's complaint is filed as a class action on behalf of numerous affiliated local unions and district councils. The defendants are Associated General Contractors of California, Inc. (Associated), a membership corporation composed of various building and construction contractors, approximately 250 members of Associated who are identified by name in an exhibit attached to the complaint, and 1,000 unidentified co-conspirators.

The Union and Associated, and their respective predecessors, have been parties to collective-bargaining agreements governing the terms and conditions of employment in construction-related industries in California for over 25 years. The wages and other benefits paid pursuant to these agreements amount to more than $750 million per year. In addition, approximately 3,000 contractors who are not members of Associated have entered into separate "memorandum agreements" with the Union, which bind them to the terms of the master collective-bargaining agreements between the Union and Associated. The amended complaint does not

state the number of nonsignatory employers or the number of nonunion employees who are active in the relevant market.

In paragraphs 23 and 24 of the amended complaint, the Union alleges the factual basis for five different damages claims.[1] Paragraph 23 alleges generally that the defendants conspired to abrogate and weaken the collective-bargaining relationship between the Union and the signatory employers. In seven subsections, paragraph 24 sets forth activities allegedly committed pursuant to the conspiracy. The most specific allegations relate to the labor relations between the parties.[2] The complaint's description of actions affecting nonparties is both brief and vague. It is alleged that defendants

"(3) Advocated, encouraged, induced, and aided nonmembers of defendant Associated General Contractors of California, Inc. to refuse to enter into collective bargaining relationships with plaintiffs and each of them;

"(4) Advocated, encouraged, induced, *coerced*, aided and encouraged owners of land and other letters of construction contracts to hire contractors and subcontractors who are not signatories to collective bargaining agreements with plaintiffs and each of them;

---

[1] The facts set forth in paragraphs 23 and 24, initially alleged in support of the Union's federal antitrust claim, are realleged in each of the other claims for relief: breach of collective-bargaining agreements (¶¶ 29–31); intentional interference with contractual relations (¶¶ 32–35); intentional interference with business relationships (¶¶ 36–39); and violation of the California antitrust statute (¶¶ 40–43).

[2] For example, it is alleged that defendants breached their collective-bargaining agreements "by failing to pay agreed-upon wages, by failing to use the hiring hall, by failing to pay Trust Fund contributions, by failing to observe other terms and conditions of employment, and by generally weakening the good faith requirement of the collective bargaining agreements"; that defendants improperly changed their names and corporate status and made use of so-called "double breasted operations"; and that they encouraged nonmembers of Associated to refuse to enter into collective-bargaining agreements with the Union.

"(5) Advocated, induced, *coerced,* encouraged, and aided members of Associated General Contractors of California, Inc., non-members of Associated General Contractors of California, Inc., and 'memorandum contractors' to enter into subcontracting agreements with subcontractors who are not signatories to any collective bargaining agreements with plaintiffs and each of them"; App. E to Pet. for Cert. 17–19 (emphasis added).[3]

Paragraph 25 describes the alleged "purpose and effect" of these activities: first, "to weaken, destroy, and restrain the trade of certain contractors," who were either members of Associated or memorandum contractors who had signed agreements with the Union; and second, to restrain "the free exercise of the business activities of plaintiffs and each of them."[4] Plaintiffs claim that these alleged antitrust viola-

---

[3] The word "coerced" did not appear in the complaint as originally filed. Even as amended after the filing of motions to dismiss, the complaint does not allege that the defendants used any coercion to persuade nonmembers of Associated to refuse to enter into collective-bargaining agreements with the Union (¶ 24(3)). The complaint alleges neither the identity nor the number of landowners, general contractors, or others who were coerced into making contracts with nonunion firms.

[4] Paragraph 25, which describes the effect of the conspiracy, reads in full as follows:

"The purpose and effect of the above described activities, plan and conspiracy are oppressive, unreasonable, and illegal, and are in restraint of trade and an unlawful interference and restraint of the free exercise of the business activities of plaintiffs and each of them, all in violation of 15 U. S. C. Section 1. The purpose and effect of the above described activities, plan and conspiracy, in addition, are to weaken, destroy, and restrain the trade of certain contractors, both members of the Associated General Contractors of California, Inc. and non-members, who are 'memorandum contractors,' who have faithfully performed the terms and conditions set out in the master collective bargaining agreements described above. The effect of this restraint on trade is to further weaken and destroy plaintiffs in this matter. These activities are in restraint of the free exercise of plaintiffs' trade and an interference therein, all in violation of 15 U. S. C. Section 1." App. E to Pet. for Cert. 20–21.

tions caused them $25 million in damages.[5]   The complaint does not identify any specific component of this damages claim.

After hearing "lengthy oral argument" and after receiving two sets of written briefs, one filed before and the second filed after this Court's decision in *Connell Construction Co. v. Plumbers & Steamfitters*, 421 U. S. 616 (1975), the District Court dismissed the complaint, including the federal antitrust claim.   404 F. Supp. 1067 (ND Cal. 1975).[6]   The court observed that the complaint alleged "a rather vague, general conspiracy," and that the allegations "appear typical of disputes a union might have with an employer," which in the normal course are resolved by grievance and arbitration or by the NLRB.   *Id.*, at 1069.[7]   Without seeking to clarify or further amend the first amended complaint, the Union filed its notice of appeal on October 9, 1975.

Over five years later, on November 20, 1980, the Court of Appeals reversed the District Court's dismissal of the Union's federal antitrust claim.   648 F. 2d 527.[8]   The ma-

---

[5] Plaintiffs do not seek injunctive relief under § 16 of the Clayton Act, 15 U. S. C. § 26, and they do not ask us to consider whether they have standing to request such relief.

[6] An order dismissing the federal antitrust claim and the state-law claims was filed on August 4, 1975, and an amended order dismissing the entire complaint was entered on September 10, 1975.   The District Court had initially stayed the breach-of-contract claim for 120 days pending grievance and arbitration procedures.   On reconsideration it also dismissed the breach-of-contract claim, deciding that the suit had been prematurely filed.

[7] Addressing the federal antitrust claim, the District Court concluded: "The essence of plaintiffs' claim seems to be that defendants violated the antitrust laws insofar as they declined to enter into agreements with plaintiffs to deal only with subcontractors which were signatories to contracts with plaintiffs, precisely the type of agreement which subjected the union in *Connell* to antitrust liability."   404 F. Supp., at 1070.
The District Court reasoned that the employers' refusal to enter into such an agreement could not provide the basis for an antitrust claim.

[8] The Court of Appeals affirmed the dismissal of all other claims.

jority of the Court of Appeals disagreed with the District Court's characterization of the antitrust claim; it adopted a construction of the amended complaint which is somewhat broader than the allegations in the pleading itself.[9] The Court of Appeals held (1) that a Sherman Act violation—a group boycott—had been alleged, *id.*, at 531–532; (2) that the defendants' conduct was not within the antitrust exemption for labor activities, *id.*, at 532–536; and (3) that the plaintiffs had standing to recover damages for the injury to their own business activities occasioned by the defendants' "industry-wide boycott against all subcontractors with whom the Unions had signed agreements . . . ." *Id.*, at 537. In support of the Union's standing, the majority reasoned that the Union was within the area of the economy endangered by a breakdown of competitive conditions, not only because injury to the Union was a foreseeable consequence of the antitrust violation, but also because that injury was specifically intended by the defendants. The court noted that its conclusion was consistent with other cases holding that union orga-

---

[9] The Court of Appeals majority read subparagraph (4) of paragraph 24, quoted *supra*, at 522, as though it alleged that the defendants had coerced landowners and other persons who let construction contracts "to hire *only* construction firms, primarily subcontractors, who had not signed with the Unions." 648 F. 2d, at 532 (emphasis added); see also *id.*, at 544 (denying petition for rehearing). The word "only" does not appear in the amended complaint, and it implies that the defendants' activities gave rise to a broader restraint than was actually alleged.

The majority read subparagraph (5) of paragraph 24 to charge that defendants had "coerced and aided each other to subcontract *only* with subcontractors who had not signed with the Unions." *Id.*, at 531 (emphasis added). Again using the word "only," which does not appear in the complaint itself, the majority characterized the defendants' alleged activities as "very similar to a concerted refusal to deal, or a group boycott." *Ibid.* It concluded that the allegations "present virtually the obverse of the situation described in *Connell*": the conspiracy, if successful, "would effectively lock union-signatory subcontractors out of a portion of the market for carpentry work." *Id.*, at 532.

nizational and representational activities constitute a form of business protected by the antitrust laws.[10]

## II

As the case comes to us, we must assume that the Union can prove the facts alleged in its amended complaint. It is not, however, proper to assume that the Union can prove facts that it has not alleged or that the defendants have violated the antitrust laws in ways that have not been alleged.[11]

We first note that the Union's most specific claims of injury involve matters that are not subject to review under the antitrust laws. The amended complaint alleges that the defendants have breached their collective-bargaining agreements in various ways, and that they have manipulated their corporate names and corporate status in order to divert business to nonunion divisions or firms that they actually control. Such deceptive diversion of business to the nonunion portion of a so-called "double-breasted" operation might constitute a breach of contract, an unfair labor practice, or perhaps even a

---

[10] See *Tugboat, Inc.* v. *Mobile Towing Co.*, 534 F. 2d 1172, 1176–1177 (CA5 1976); *International Assn. of Heat & Frost Insulators* v. *United Contractors Assn.*, 483 F. 2d 384, 397–398 (CA3 1973).

Circuit Judge Sneed dissented. He first rejected the majority's characterization of the complaint, agreeing instead with the District Court. Second, assuming that the complaint alleged a boycott of certain employers, he concluded that neither the employees of a victim of the boycott nor their collective-bargaining representative had standing to assert the antitrust claim. Finally, he concluded that an injury that affected only the Union's organizational and representational activity was remediable under the labor laws rather than the antitrust laws.

The Court of Appeals denied the petition for rehearing and rehearing en banc on May 22, 1981. Accompanying the order was a statement by the majority rebutting the petitioners' assertion that the opinion rendered multiemployer bargaining units unlawful, and a dissent by Circuit Judge Sneed. 648 F. 2d, at 543, 545.

[11] The Union had an adequate opportunity to amend its pleading to add factual allegations demonstrating that the District Court's decision to dismiss the complaint was based on a misunderstanding of its antitrust claim.

common-law fraud or deceit, but in the context of the bargaining relationship between the parties to this litigation, such activities are plainly not subject to review under the federal antitrust laws.[12]   Similarly, the charge that the defendants "advocated, encouraged, induced, and aided nonmembers . . . to refuse to enter into collective bargaining relationships" with the Union (¶24(3)) does not describe an antitrust violation.[13]

The Union's antitrust claims arise from alleged restraints caused by defendants in the market for construction contracting and subcontracting.[14]   The complaint alleges that defendants "coerced"[15] two classes of persons: (1) landowners and

[12] In analyzing the antitrust allegations in the amended complaint, we therefore construe the references to "contractors and subcontractors who are not signatories to collective bargaining agreements" as referring to completely independent nonunion firms rather than to operations covertly controlled by one or more defendants.

[13] The Court of Appeals did not reverse the District Court's dismissal of the complaint with regard to these allegations.   648 F. 2d, at 531–532, 537, 540.

[14] See Brief for Respondents 37.   There is no allegation of wrongful conduct directed at nonunion subcontracting firms.   We therefore assume that, if any nonunion firms refused to bargain with the Union because of the conspiracy, they did so because they were rewarded with business they would not otherwise have obtained.   Thus, nonunion firms could not be considered victims of the conspiracy; rather, they appear to have been its indirect beneficiaries.   None are named either as defendants or as co-conspirators.

The amended complaint also does not allege any restraint on competition in the market for labor union services.   Unlike the two cases involving union plaintiffs cited by the Court of Appeals, see n. 10, *supra*, in this case there is no claim that competition between rival unions has been injured or even that any rival unions exist.

[15] The complaint does not specify the nature of the "coercion."   It does not, for example, allege that the defendants refused to deal with all members of either of the two classes of persons against whom coercion was applied.   Indeed, it is highly improbable that the defendants—all of whom are signatories to union contracts—would refuse to deal with all of their customers and potential customers in an attempt to divert all of their business to nonunion firms.

others who let construction contracts, *i. e.*, the defendants' customers and potential customers; and (2) general contractors, *i. e.*, defendants' competitors and defendants themselves. Coercion against the members of both classes was designed to induce them to give some of their business—but not necessarily all of it—to nonunion firms.[16] Although the pleading does not allege that the coercive conduct increased the aggregate share of nonunion firms in the market, it does allege that defendants' activities weakened and restrained the trade "of certain contractors." See n. 4, *supra*. Thus, particular victims of coercion may have diverted particular contracts to nonunion firms and thereby caused certain unionized subcontractors to lose some business.

We think the Court of Appeals properly assumed that such coercion might violate the antitrust laws.[17] An agreement to restrain trade may be unlawful even though it does not entirely exclude its victims from the market. See *Associated Press* v. *United States*, 326 U. S. 1, 17 (1945). Coercive activity that prevents its victims from making free choices between market alternatives is inherently destructive of competitive conditions and may be condemned even without proof of its actual market effect. Cf. *Klors, Inc.* v. *Broadway-Hale Stores, Inc.*, 359 U. S. 207, 210–214 (1959).[18]

---

[16] There is no allegation that any person subjected to coercion was required to deal exclusively with nonunion firms.

[17] Had the District Court required the Union to describe the nature of the alleged coercion with particularity before ruling on the motion to dismiss, it might well have been evident that no violation of law had been alleged. In making the contrary assumption for purposes of our decision, we are perhaps stretching the rule of *Conley* v. *Gibson*, 355 U. S. 41, 47–48 (1957), too far. Certainly in a case of this magnitude, a district court must retain the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed.

[18] Although we do not know what kind of coercion defendants allegedly employed, we assume for purposes of decision that it had a predatory "nature or character," *Klors, Inc.* v. *Broadway-Hale Stores, Inc.*, 359 U. S.,

Even though coercion directed by defendants at third parties in order to restrain the trade of "certain" contractors and subcontractors may have been unlawful, it does not, of course, necessarily follow that still another party—the Union—is a person injured by reason of a violation of the antitrust laws within the meaning of § 4 of the Clayton Act.

### III

We first consider the language in the controlling statute. See *Consumer Product Safety Comm'n* v. *GTE Sylvania, Inc.*, 447 U. S. 102, 108 (1980). The class of persons who may maintain a private damages action under the antitrust laws is broadly defined in § 4 of the Clayton Act. 15 U. S. C. § 15. That section provides:

> "Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee."

A literal reading of the statute is broad enough to encompass every harm that can be attributed directly or indirectly to the consequences of an antitrust violation. Some of our prior cases have paraphrased the statute in an equally expansive way.[19] But before we hold that the statute is as broad as its

---

at 211, and that it would "cripple the freedom of traders and thereby restrain their ability to sell in accordance with their own judgment." *Kiefer-Stewart Co.* v. *Joseph E. Seagram & Sons, Inc.*, 340 U. S. 211, 213 (1951).

[19] In *Mandeville Island Farms, Inc.* v. *Sugar Co.*, 334 U. S. 219 (1948), the Court held that growers of sugar beets could maintain a treble-damages action against refiners who had allegedly conspired to fix the price that they would pay for the beets. Although previous price-fixing cases had involved agreements among sellers to fix sales prices, the Court readily concluded that the Act applied equally to an agreement among competing buyers to fix purchase prices. The Court stated:

words suggest, we must consider whether Congress intended such an open-ended meaning.

The critical statutory language was originally enacted in 1890 as § 7 of the Sherman Act. 26 Stat. 210. The legislative history of the section shows that Congress was primarily interested in creating an effective remedy for consumers who were forced to pay excessive prices by the giant trusts and combinations that dominated certain interstate markets.[20] That history supports a broad construction of this remedial provision. A proper interpretation of the section cannot, however, ignore the larger context in which the entire statute was debated.

---

"The statute does not confine its protection to consumers, or to purchasers, or to competitors, or to sellers. Nor does it immunize the outlawed acts because they are done by any of these. Cf. *United States* v. *Socony-Vacuum Oil Co.*, 310 U. S. 150; *American Tobacco Co.* v. *United States*, 328 U. S. 781. The Act is comprehensive in its terms and coverage, protecting all who are made victims of the forbidden practices by whomever they may be perpetrated." *Id.*, at 236.

Similarly broad language was used in later cases holding that actions could be maintained by consumers, *Reiter* v. *Sonotone Corp.*, 442 U. S. 330, 337–338 (1979), by a foreign government, *Pfizer Inc.* v. *India*, 434 U. S. 308, 313–314 (1978), and by the direct victim of a boycott. *Blue Shield of Virginia* v. *McCready*, 457 U. S. 465, 472–473 (1982). In each of those cases, however, the actual plaintiff was directly harmed by the defendants' unlawful conduct. The paraphrasing of the language of § 4 in those opinions added nothing to the even broader language that the statute itself contains.

[20] See 21 Cong. Rec. 1767–1768, 2455–2456, 2459, 2615, 3147–3148 (1890). The original proposal, which merely allowed recovery of the amount of actual enhancement in price, was successively amended to authorize double-damages and then treble-damages recoveries, in order to provide otherwise remediless small consumers with an adequate incentive to bring suit. *Id.*, at 1765, 2455, 3145. The same purpose was served by the special venue provisions, the provision for the recovery of attorney's fees, and the elimination of any requirement that the amount in controversy exceed the jurisdictional threshold applicable in other federal litigation. See, *e. g.*, *id.*, at 2612, 3149. Moreover, changes in the description of the remedy extended the section's coverage beyond price fixing.

The repeated references to the common law in the debates that preceded the enactment of the Sherman Act make it clear that Congress intended the Act to be construed in the light of its common-law background.[21]   Senator Sherman stated that the bill "does not announce a new principle of law, but applies old and well recognized principles of the common law to the complicated jurisdiction of our State and Federal Government."[22]   Thus our comments on the need for judicial interpretation of § 1 are equally applicable to § 7:

> "One problem presented by the language of § 1 of the Sherman Act is that it cannot mean what it says.   The statute says that 'every' contract that restrains trade is unlawful.   But, as Mr. Justice Brandeis perceptively noted, restraint is the very essence of every contract; read literally, § 1 would outlaw the entire body of private contract law. . . .
>
> "Congress, however, did not intend the text of the Sherman Act to delineate the full meaning of the statute or its application in concrete situations.   The legislative history makes it perfectly clear that it expected the courts to give shape to the statute's broad mandate by drawing on common-law tradition."   *National Society of*

---

[21] See, *e. g., id.*, at 2456, 2459, 3151–3152.

[22] *Id.*, at 2456.   Senator Sherman added: "The purpose of this bill is to enable the courts of the United States to apply the same remedies against combinations which injuriously affect the interests of the United States that have been applied in the several States to protect local interests." *Ibid.;* see also *id.*, at 2459, 3149, 3151–3152.   Although Members of Congress referred particularly to common-law definitions of "monopoly" and "restraint of trade," they appear to have been generally aware that the statute would be construed by common-law courts in accordance with traditional canons.   For example, at the beginning of the debate on the Sherman Act, one Senator cautioned his colleagues:
"A careful analysis of the terms of the bill is essential.   We must know what it means, what its legal effect is, if we give force to it as it is written. . . . We must adopt, therefore, the known methods of the courts in determining what the bill means." *Id.*, at 1765.

*Professional Engineers* v. *United States*, 435 U. S. 679, 687–688 (1978) (footnotes omitted).

Just as the substantive content of the Sherman Act draws meaning from its common-law antecedents, so must we consider the contemporary legal context in which Congress acted when we try to ascertain the intended scope of the private remedy created by § 7.

In 1890, notwithstanding general language in many state constitutions providing in substance that "every wrong shall have a remedy," [23] a number of judge-made rules circumscribed the availability of damages recoveries in both tort and contract litigation—doctrines such as foreseeability and proximate cause, [24] directness of injury, [25] certainty of dam-

---

[23] For example, the State Constitution of Illinois, adopted in 1870, provided: "Every person ought to find a certain remedy in the laws for all injuries and wrongs which he may receive in his person, property or reputation . . . ." Art. II, § 19. Comparable provisions were found in the State Constitutions of Arkansas, Connecticut, Delaware, Indiana, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Minnesota, Mississippi, New Hampshire, Ohio, and Vermont. See generally F. Hough, American Constitutions (1871).

[24] One treatise stated: "Natural, proximate, and legal results are all that damages can be recovered for, even under a statute entitling one 'to recover *any* damage.'" 3 J. Lawson, Rights, Remedies, and Practice 1740 (1890). Another leading treatise explained:

"The chief and sufficient reason for this rule is to be found in the impossibility of tracing consequences through successive steps to the remote cause, and the necessity of pausing in the investigation of the chain of events at the point beyond which experience and observation convince us we cannot press our inquiries with safety." T. Cooley, Law of Torts 73 (2d ed. 1888).

[25] In torts, a leading treatise on damages set forth the general principle that, *"[w]here the plaintiff sustains injury from the defendant's conduct to a third person, it is too remote,* if the plaintiff sustains no other than a contract relation to such a third person, or is under contract obligation on his account, and the injury consists only in impairing the ability or inclination of such person to perform his part, or in increasing the plaintiff's expense or labor of fulfilling such contract, unless the wrongful act is willful for that purpose." Thus, A, who had agreed with a town to support all the town paupers for a specific period, in return for a fixed sum, had no cause of ac-

ages,[26] and privity of contract.[27]   Although particular common-
law limitations were not debated in Congress, the frequent
references to common-law principles imply that Congress
simply assumed that antitrust damages litigation would be
subject to constraints comparable to well-accepted common-
law rules applied in comparable litigation.[28]

The federal judges who first confronted the task of giving
meaning to § 7 so understood the congressional intent.   Thus
in 1910 the Court of Appeals for the Third Circuit held as a
matter of law that neither a creditor nor a stockholder of a
corporation that was injured by a violation of the antitrust
laws could recover treble damages under § 7.   *Loeb* v. *East-*

----

tion against S for assaulting and beating one of the paupers, thereby
putting A to increased expense.   Similarly, a purchaser under an output
contract with a manufacturer had no right of recovery against a trespasser
who stopped the company's machinery, and a creditor could not recover
against a person who had forged a note, causing diminution in the divi-
dends from an estate.   1 J. Sutherland, Law of Damages 55–56 (1882) (em-
phasis in original, footnote omitted).

Similarly, in contract, the common-law courts drew a distinction be-
tween direct and consequential damages; the latter had to be specifically
included in the contract to be recoverable.   See *id.*, at 74–93; 1
T. Sedgwick, Measure of Damages 203–244 (8th ed. 1891) (discussing the
rule of *Hadley* v. *Baxendale*, 9 Exch. 341, 156 Eng. Rep. 145 (1854)).

[26] The common law required the plaintiff to prove, with certainty, both
the existence of damages and the causal connection between the wrong and
the injury.   No damages could be recovered for uncertain, conjectural, or
speculative losses.   See generally cases cited in F. Bohlen, Cases on the
Law of Torts 292–312 (2d ed. 1925) (cases alleging emotional harm to plain-
tiff).   Even if the injury was easily provable, there would be no recovery if
the plaintiff could not sufficiently establish the causal connection.   See 1
Sutherland, *supra* n. 25, at 94–126; 1 Sedgwick, *supra* n. 25, at 245–294.

[27] See, *e. g.*, *Winterbottom* v. *Wright*, 10 M. & W. 109, 152 Eng. Rep. 402
(Ex. 1842).

[28] See n. 22, *supra*.   The common law, of course, is an evolving body of
law.   We do not mean to intimate that the limitations on damages recover-
ies found in common-law actions in 1890 were intended to serve perma-
nently as limits on Sherman Act recoveries.   But legislators familiar with
these limits could hardly have intended the language of § 7 to be taken
literally.

*man Kodak Co.*, 183 F. 704. The court explained that the plaintiff's injury as a stockholder was "indirect, remote, and consequential." *Id.*, at 709.[29] This holding was consistent with Justice Holmes' explanation of a similar construction of the remedial provision of the Interstate Commerce Act a few years later: "The general tendency of the law, in regard to damages at least, is not to go beyond the first step." *Southern Pacific Co.* v. *Darnell-Taenzer Lumber Co.*, 245 U. S. 531, 533 (1918).[30] When Congress enacted § 4 of the Clayton Act in 1914, and when it reenacted that section in 1955, 69 Stat. 282, it adopted the language of § 7 and presumably also the judicial gloss that avoided a simple literal interpretation.

As this Court has observed, the lower federal courts have been "virtually unanimous in concluding that Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation." *Hawaii* v. *Standard Oil Co.*, 405 U. S. 251, 263, n. 14 (1972). Just last Term we stated:

"An antitrust violation may be expected to cause ripples of harm to flow through the Nation's economy; but 'despite the broad wording of § 4 there is a point beyond which the wrongdoer should not be held liable.' [*Illi-*

---

[29] See also *Ames* v. *American Telephone & Telegraph Co.*, 166 F. 820 (CC Mass. 1909). Applying "ordinary principles of law" to the general language of the statute, the court held that a stockholder had no legally cognizable antitrust claim against defendants for illegally acquiring the corporation, thereby rendering plaintiff's stock worthless. Plaintiff's claim was not distinguishable from any injury sustained by the company itself. Therefore, the court stated, a contrary result would "subject the defendant not merely to treble damages, but to sextuple damages, for the same unlawful act." *Id.*, at 823.

[30] The Court held in that case that the plaintiff shippers could recover damages from the defendant railroad for charging an excessive freight rate, even though they had been able to pass on the damage to their purchasers. Justice Holmes wrote that the law holds the defendant "liable if proximately the plaintiff has suffered a loss," but "does not attribute remote consequences to a defendant." 245 U. S., at 533–534.

*nois Brick Co.* v. *Illinois,* 431 U. S.], at 760 (BRENNAN, J., dissenting). It is reasonable to assume that Congress did not intend to allow every person tangentially affected by an antitrust violation to maintain an action to recover threefold damages for the injury to his business or property." *Blue Shield of Virginia* v. *McCready,* 457 U. S. 465, 476–477 (1982).

It is plain, therefore, that the question whether the Union may recover for the injury it allegedly suffered by reason of the defendants' coercion against certain third parties cannot be answered simply by reference to the broad language of § 4. Instead, as was required in common-law damages litigation in 1890, the question requires us to evaluate the plaintiff's harm, the alleged wrongdoing by the defendants, and the relationship between them.[31]

## IV

There is a similarity between the struggle of common-law judges to articulate a precise definition of the concept of "proximate cause,"[32] and the struggle of federal judges to

---

[31] The label "antitrust standing" has traditionally been applied to some of the elements of this inquiry. As commentators have observed, the focus of the doctrine of "antitrust standing" is somewhat different from that of standing as a constitutional doctrine. Harm to the antitrust plaintiff is sufficient to satisfy the constitutional standing requirement of injury in fact, but the court must make a further determination whether the plaintiff is a proper party to bring a private antitrust action. See Berger & Bernstein, An Analytical Framework for Antitrust Standing, 86 Yale L. J. 809, 813, n. 11 (1977); Pollock, Standing to Sue, Remoteness of Injury, and the Passing-On Doctrine, 32 A. B. A. Antitrust L. J. 5, 6–7 (1966).

[32] In his comment, *Mahoney v. Beatman:* A Study in Proximate Cause, 39 Yale L. J. 532, 533 (1930), Leon Green noted: "Legal theory is too rich in content not to afford alternative ways, and frequently several of them, for stating an acceptable judgment." Earlier, in his Rationale of Proximate Cause 135–136 (1927) (footnote omitted), Green had written:

" 'Cause,' although irreducible in its concept, could not escape the ruffles and decorations so generously bestowed: remote, proximate, direct, immediate, adequate, efficient, operative, inducing, moving, active, real, effec-

articulate a precise test to determine whether a party injured by an antitrust violation may recover treble damages.[33] It is common ground that the judicial remedy cannot encompass every conceivable harm that can be traced to alleged wrongdoing. In both situations the infinite variety of claims that may arise make it virtually impossible to announce a blackletter rule that will dictate the result in every case.[34] In-

tive, decisive, supervening, primary, original, contributory, ultimate, concurrent, causa causans, legal, responsible, dominating, natural, probable, and others. The difficulty now is in getting any one to believe that so simple a creature could have been so extravagantly garbed."

[33] Some courts have focused on the directness of the injury, *e. g.*, *Loeb* v. *Eastman Kodak Co.*, 183 F. 704, 709 (CA3 1910); *Productive Inventions, Inc.* v. *Trico Products Corp.*, 224 F. 2d 678, 679 (CA2 1955), cert. denied, 350 U. S. 936 (1956); *Volasco Products Co.* v. *Lloyd A. Fry Roofing Co.*, 308 F. 2d 383, 394–395 (CA6 1962), cert. denied, 372 U. S. 907 (1963). Others have applied the requirement that the plaintiff must be in the "target area" of the antitrust conspiracy, that is, the area of the economy which is endangered by a breakdown of competitive conditions in a particular industry. *E. g.*, *Pan-Islamic Trade Corp.* v. *Exxon Corp.*, 632 F. 2d 539, 546–547 (CA5 1980); *Engine Specialties, Inc.* v. *Bombardier Ltd.*, 605 F. 2d 1, 17–18 (CA1 1979); *Calderone Enterprises Corp.* v. *United Artists Theater Circuit, Inc.*, 454 F. 2d 1292, 1292–1295 (CA2 1971). Another Court of Appeals has asked whether the injury is "arguably within the zone of interests protected by the antitrust laws." *Malamud* v. *Sinclair Oil Corp.*, 521 F. 2d 1142, 1151–1152 (CA6 1975). See generally Berger & Bernstein, *supra* n. 31.

As a number of commentators have observed, these labels may lead to contradictory and inconsistent results. See Berger & Bernstein, *supra* n. 31, at 835, 843; Handler, The Shift From Substantive to Procedural Innovations in Antitrust Suits, 71 Colum. L. Rev. 1, 27–31 (1971); Sherman, Antitrust Standing: From *Loeb* to *Malamud*, 51 N. Y. U. L. Rev. 374, 407 (1976) ("it is simply not possible to fashion an across-the-board and easily applied standing rule which can serve as a tool of decision for every case"). In our view, courts should analyze each situation in light of the factors set forth in the text *infra*.

[34] Cf. *Blue Shield of Virginia* v. *McCready*, 457 U. S., at 477–478, n. 13 (discussing elusiveness of test of proximate cause); *Palsgraf* v. *Long Island R. Co.*, 248 N. Y. 339, 162 N. E. 99 (1928); *id.*, at 351–352, 162 N. E., at 103 (Andrews, J., dissenting) ("What is a cause in a legal sense, still more what is a proximate cause, depend in each case upon many consider-

stead, previously decided cases identify factors that circumscribe and guide the exercise of judgment in deciding whether the law affords a remedy in specific circumstances.

The factors that favor judicial recognition of the Union's antitrust claim are easily stated. The complaint does allege a causal connection between an antitrust violation and harm to the Union and further alleges that the defendants intended to cause that harm. As we have indicated, however, the mere fact that the claim is literally encompassed by the Clayton Act does not end the inquiry. We are also satisfied that an allegation of improper motive, although it may support a plaintiff's damages claim under § 4,[35] is not a panacea that will enable any complaint to withstand a motion to dismiss.[36] Indeed, in *McCready*, we specifically held: "The availability of the § 4 remedy to some person who claims its benefit is not a question of the specific intent of the conspirators." 457 U. S., at 479.[37]

---

ations . . . . What we do mean by the word 'proximate' is, that because of convenience, of public policy, of a rough sense of justice, the law arbitrarily declines to trace a series of events beyond a certain point").

[35] It is well settled that a defendant's specific intent may sometimes be relevant to the question whether a violation of law has been alleged. See *United States* v. *Columbia Steel Co.*, 334 U. S. 495, 522 (1948). Moreover, there no doubt are cases in which such an allegation would adequately support a plaintiff's claim under § 4. Cf. Handler, *supra* n. 33, at 30 (specific intent of defendant to cause injury to a particular class of persons should "ordinarily be dispositive" in creating standing to sue); Lytle & Purdue, Antitrust Target Area Under Section 4 of the Clayton Act: Determination of Standing in Light of the Alleged Antitrust Violation, 25 Am. U. L. Rev. 795, 814–816 (1976) (suggesting that standing in a group boycott situation should be based on the purpose of the boycott).

[36] See Sherman, *supra* n. 33, at 389–391, citing *Billy Baxter, Inc.* v. *Coca-Cola Co.*, 431 F. 2d 183, 189 (CA2 1970), cert. denied, 401 U. S. 923 (1971).

[37] In *McCready* we rejected the contention that, because there was no specific intent to harm the plaintiff, her injury was thereby rendered remote. This case presents a different question, but in neither case is the motive allegation of controlling importance.

A number of other factors may be controlling. In this case it is appropriate to focus on the nature of the plaintiff's alleged injury. As the legislative history shows, the Sherman Act was enacted to assure customers the benefits of price competition, and our prior cases have emphasized the central interest in protecting the economic freedom of participants in the relevant market.[38] Last Term in *Blue Shield of Virginia* v. *McCready, supra,* we identified the relevance of this central policy to a determination of the plaintiff's right to maintain an action under § 4. McCready alleged that she was a consumer of psychotherapeutic services and that she had been injured by the defendants' conspiracy to restrain competition in the market for such services.[39] The Court stressed the fact that "McCready's injury was of a type that Congress sought to redress in providing a private remedy for violations of the antitrust laws." 457 U. S., at 483, citing *Brunswick Corp.* v. *Pueblo Bowl-O-Mat, Inc.,* 429 U. S. 477, 487–489 (1977). After noting that her injury "was inextricably intertwined with the injury the conspirators sought to inflict on psychologists and the psychotherapy market," 457 U. S., at 484, the Court concluded that such an injury "falls squarely within the area of congressional concern." *Ibid.*

---

[38] See *United States* v. *Topco Associates, Inc.,* 405 U. S. 596, 610 (1972) ("Antitrust laws in general, and the Sherman Act in particular, are the Magna Carta of free enterprise. They are as important to the preservation of economic freedom and our free-enterprise system as the Bill of Rights is to the protection of our fundamental personal freedoms. And the freedom guaranteed each and every business, no matter how small, is the freedom to compete—to assert with vigor, imagination, devotion, and ingenuity whatever economic muscle it can muster").

[39] McCready, a Blue Shield subscriber, alleged that Blue Shield and the Neuropsychiatric Society of Virginia, Inc., had unlawfully conspired to restrain competition in the market for psychotherapeutic services by providing insurance coverage only for consumers who patronized psychiatrists, not psychologists. McCready obtained services from a psychologist and was denied reimbursement.

In this case, however, the Union was neither a consumer nor a competitor in the market in which trade was restrained.[40]   It is not clear whether the Union's interests would be served or disserved by enhanced competition in the market.   As a general matter, a union's primary goal is to enhance the earnings and improve the working conditions of its membership; that goal is not necessarily served, and indeed may actually be harmed, by uninhibited competition among employers striving to reduce costs in order to obtain a competitive advantage over their rivals.[41]   At common law— as well as in the early days of administration of the federal antitrust laws—the collective activities of labor unions were regarded as a form of conspiracy in restraint of trade.[42]   Federal policy has since developed not only a broad labor exemption from the antitrust laws,[43] but also a separate body of

---

[40] Moreover, it has not even alleged any marketwide restraint of trade. The allegedly unlawful conduct involves predatory behavior directed at "certain" parties, rather than a claim that output has been curtailed or prices enhanced throughout an entire competitive market.

[41] In *Mine Workers* v. *Pennington*, 381 U. S. 657, 664 (1965), the Court recognized that wages lie at the heart of the subjects of mandatory collective bargaining, and that "the elimination of competition based on wages among the employers in the bargaining unit," which directly benefits the union, also has an effect on competition in the product market.   See generally Leslie, Principles of Labor Antitrust, 66 Va. L. Rev. 1183, 1185–1188 (1980); Winter, Collective Bargaining and Competition: The Application of Antitrust Standards to Union Activities, 73 Yale L. J. 14, 17–20, 28–30 (1963).

[42] See, *e. g., Coronado Coal Co.* v. *Mine Workers*, 268 U. S. 295, 310 (1925) (applying Sherman Act to alleged conspiracy by unions involved in labor dispute to restrain interstate trade in coal); *Loewe* v. *Lawlor*, 208 U. S. 274 (1908) (applying Sherman Act to boycott by labor organization seeking to unionize plaintiff's hat factory); Cox, Labor and the Antitrust Laws—A Preliminary Analysis, 104 U. Pa. L. Rev. 252, 256–262 (1955); Meltzer, Labor Unions, Collective Bargaining, and the Antitrust Laws, 32 U. Chi. L. Rev. 659, 661–666 (1965); Winter, *supra* n. 41, at 30–38.

[43] See 29 U. S. C. § 52 (statutory labor exemption); *Mine Workers* v. *Pennington, supra; Meat Cutters* v. *Jewel Tea Co.*, 381 U. S. 676 (1965) (nonstatutory exemption).   In this case we need not reach petitioner's con-

labor law specifically designed to protect and encourage the organizational and representational activities of labor unions. Set against this background, a union, in its capacity as bargaining representative, will frequently not be part of the class the Sherman Act was designed to protect, especially in disputes with employers with whom it bargains. In each case its alleged injury must be analyzed to determine whether it is of the type that the antitrust statute was intended to forestall. See *Brunswick Corp.* v. *Pueblo Bowl-O-Mat, Inc.*, *supra*, at 487–488. In this case, particularly in light of the longstanding collective-bargaining relationship between the parties, the Union's labor-market interests seem to predominate, and the *Brunswick* test is not satisfied.

An additional factor is the directness or indirectness of the asserted injury. In this case, the chain of causation between the Union's injury and the alleged restraint in the market for construction subcontracts contains several somewhat vaguely defined links. According to the complaint, defendants applied coercion against certain landowners and other contracting parties in order to cause them to divert business from certain union contractors to nonunion contractors.[44] As a re-

---

tentions that the alleged activities are within the statutory and nonstatutory labor exemptions.

[44] There is a parallel between these allegations and the claim in *Connell Construction Co.* v. *Plumbers & Steamfitters*, 421 U. S. 616 (1975). The plaintiff in that case, a general building contractor, was coerced by the defendant union into signing an agreement not to deal with nonunion subcontractors. Similarly, in the *McCready* case, the plaintiff was the direct victim of unlawful coercion. As the Court noted, "McCready did not yield to Blue Shield's coercive pressure, and bore Blue Shield's sanction in the form of an increase in the net cost of her psychologist's services." 457 U. S., at 483. Her status was thus comparable to that of a contracting or subcontracting firm that refused to yield to the defendants' coercive practices and therefore suffered whatever sanction that coercion imposed. Like McCready, and like Connell Construction Co., such a firm could maintain an action against the defendants. In contrast, the Union is neither a participant in the market for construction contracts or subcontracts nor a direct victim of the defendants' coercive practices. We therefore need not

sult, the Union's complaint alleges, the Union suffered unspecified injuries in its "business activities."[45] It is obvious that any such injuries were only an indirect result of whatever harm may have been suffered by "certain" construction contractors and subcontractors.[46]

If either these firms, or the immediate victims of coercion by defendants, have been injured by an antitrust violation, their injuries would be direct and, as we held in *McCready*, they would have a right to maintain their own treble-damages actions against the defendants. An action on their behalf would encounter none of the conceptual difficulties that

decide whether the direct victim of a boycott, who suffers a type of injury unrelated to antitrust policy, may recover damages when the ultimate purpose of the boycott is to restrain competition in the relevant economic market.

[45] Its brief merely echoes the Court of Appeals' description of its allegations: "the Unions have been injured in their business, i. e., organizing carpentry industry employees, negotiating and policing collective bargaining agreements, and securing jobs for their members." Brief for Respondents 25–26.

[46] Because of the absence of specific allegations, we can only speculate about the specific components of the Union's claim. If the Union asserts that its attempts to organize previously nonunion firms have been frustrated because nonunion firms wish to continue to obtain business from those subjected to coercion by the defendants, its harm stems most directly from the conduct of persons who are not victims of the conspiracy. See n. 14, *supra*. If the Union claims that dues payments were adversely affected because employees had less incentive to join the Union in light of expanding nonunion job opportunities, its damage is more remote than the harm allegedly suffered by unionized subcontractors. The same is true if the Union contends that revenues from dues payments declined because its members lost jobs or wages because their unionized employers lost business. That harm, moreover, is even more indirect than the already indirect injury to its members, yet a number of decisions have denied standing to employees with merely derivative injuries. See, *e. g., Pitchford* v. *PEPI, Inc.*, 531 F. 2d 92, 97 (CA3), cert. denied, 426 U. S. 935 (1976); *Contreras* v. *Grower Shipper Vegetable Assn.*, 484 F. 2d 1346 (CA9 1973), cert. denied, 415 U. S. 932 (1974); *Reibert* v. *Atlantic Richfield Co.*, 471 F. 2d 727 (CA10), cert. denied, 411 U. S. 938 (1973). But see *Nichols* v. *Spencer Int'l Press, Inc.*, 371 F. 2d 332, 334 (CA7 1967).

encumber the Union's claim.[47]   The existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement diminishes the justification for allowing a more remote party such as the Union to perform the office of a private attorney general.[48]   Denying the Union a remedy on the basis of its allegations in this case is not likely to leave a significant antitrust violation undetected or unremedied.

Partly because it is indirect, and partly because the alleged effects on the Union may have been produced by independent factors, the Union's damages claim is also highly speculative.   There is, for example, no allegation that any collective-bargaining agreement was terminated as a result of the coercion, no allegation that the aggregate share of the contracting market controlled by union firms has diminished, no allegation that the number of employed union members has declined, and no allegation that the Union's revenues in the form of dues or initiation fees have decreased.   Moreover, although coercion against certain firms is alleged, there is no assertion that any such firm was prevented from doing business with any union firms or that any firm or group of firms was subjected to a complete boycott.   See nn. 9, 15, and 16, *supra.*

---

[47] Indeed, if there is substance to the Union's claim, it is difficult to understand why these direct victims of the conspiracy have not asserted any claim in their own right.   The Union's suggested explanations of this fact tend to shed doubt on the proposition that these "victims" were actually harmed at all.

"Many unionized firms will respond to the alleged boycott . . . by setting up double-breasted operations or shifting more of their resources to the non-unionized part of their operations when double-breasted operations already exist.   In this manner, unionized subcontractors can avoid losing any business and, as a result, these subcontractors will *not* 'possess the classic economic incentive to file suit.'   Alternatively, unionized subcontractors may simply not renew the collective bargaining agreement when it expires."   Brief for Respondents 49 (citation omitted).

[48] Cf. *Blue Chip Stamps* v. *Manor Drug Stores,* 421 U. S. 723, 739–748 (1975) (purchaser-seller limitation on actions under § 10(b) of Securities Exchange Act of 1934).

Other than the alleged injuries flowing from breaches of the collective-bargaining agreements—injuries that would be remediable under other laws—nothing but speculation informs the Union's claim of injury by reason of the alleged unlawful coercion. Yet, as we have recently reiterated, it is appropriate for § 4 purposes "to consider whether a claim rests at bottom on some abstract conception or speculative measure of harm." *Blue Shield of Virginia* v. *McCready*, 457 U. S., at 475, n. 11, citing *Hawaii* v. *Standard Oil Co.*, 405 U. S., at 262–263, n. 14.[49]

The indirectness of the alleged injury also implicates the strong interest, identified in our prior cases, in keeping the scope of complex antitrust trials within judicially manageable limits.[50] These cases have stressed the importance of avoid-

---

[49] We expressly noted in *McCready:*

"[O]ur cautious approach to speculative, abstract, or impractical damages theories has no application to McCready's suit. The nature of her injury is easily stated: As the result of an unlawful boycott, Blue Shield failed to pay the cost she incurred for the services of a psychologist. Her damages were fixed by the plan contract and, as the Court of Appeals observed, they could be 'ascertained to the penny.'" 457 U. S., at 475–476, n. 11.

[50] This interest was also identified in the legislative debates preceding the enactment of the Sherman Act. Speaking in opposition to a proposed amendment that might have complicated the procedures in private actions, Senator Edmunds said:

"Therefore I say as to the suggested amendment of my friend from Mississippi—and I repeat it in all earnestness—that if I were a lobbyist and wanted to entangle this business, I should provide that everybody might sue everybody else in one common suit and have a regular *pot-pourri* of the affair, as his amendment proposes, and leave it to the lawyers of the trust to have an interminable litigation in respect of the proper parties, whether their interests were common or diverse or how they were affected, and take twenty years in order to get a result as to a single one of them. The Judiciary Committee did not think it wise to do that sort of thing, because we were in earnest about the business, as I know my friend is." 21 Cong. Rec. 3148 (1890).

See also *id.*, at 3149 (remarks of Senator Morgan opposing same amendment: "There is as much harm in trying to do too much as there is in not

ing either the risk of duplicate recoveries on the one hand, or the danger of complex apportionment of damages on the other. Thus, in *Hanover Shoe, Inc.* v. *United Shoe Machinery Corp.*, 392 U. S. 481 (1968), we refused to allow the defendants to discount the plaintiffs' damages claim to the extent that overcharges had been passed on to the plaintiffs' customers. We noted that any attempt to ascertain damages with such precision "would often require additional long and complicated proceedings involving massive evidence and complicated theories." *Id.*, at 493. In *Illinois Brick Co.* v. *Illinois*, 431 U. S. 720 (1977), we held that treble damages could not be recovered by indirect purchasers of concrete blocks who had paid an enhanced price because their suppliers had been victimized by a price-fixing conspiracy. We observed that potential plaintiffs at each level in the distribution chain would be in a position to assert conflicting claims to a common fund, the amount of the alleged overcharge, thereby creating the danger of multiple liability for the fund and prejudice to absent plaintiffs.

> "Permitting the use of pass-on theories under § 4 essentially would transform treble-damages actions into massive efforts to apportion the recovery among all potential plaintiffs that could have absorbed part of the overcharge—from direct purchasers to middlemen to ultimate consumers. However appealing this attempt to allocate the overcharge might seem in theory, it would add whole new dimensions of complexity to treble-damages suits and seriously undermine their effectiveness." *Id.*, at 737–738.

The same concerns should guide us in determining whether the Union is a proper plaintiff under § 4 of the Clayton Act.[51]

---

trying to do anything, and I think we have stopped at about the proper line in this bill, and I shall support it just as it is").

[51] We pointed out in *McCready*, 457 U. S., at 475, n. 11:

"If there is a subordinate theme to our opinions in *Hawaii* and *Illinois Brick*, it is that the feasibility and consequences of implementing particular

As the Court wrote in *Illinois Brick*, massive and complex damages litigation not only burdens the courts, but also undermines the effectiveness of treble-damages suits. *Id.*, at 745. In this case, if the Union's complaint asserts a claim for damages under § 4, the District Court would face problems of identifying damages and apportioning them among directly victimized contractors and subcontractors and indirectly affected employees and union entities. It would be necessary to determine to what extent the coerced firms diverted business away from union subcontractors, and then to what extent those subcontractors absorbed the damage to their businesses or passed it on to employees by reducing the work force or cutting hours or wages. In turn it would be necessary to ascertain the extent to which the affected employees absorbed their losses and continued to pay union dues.[52]

We conclude, therefore, that the Union's allegations of consequential harm resulting from a violation of the antitrust laws, although buttressed by an allegation of intent to harm the Union, are insufficient as a matter of law. Other relevant factors—the nature of the Union's injury, the tenuous and speculative character of the relationship between the alleged antitrust violation and the Union's alleged injury, the potential for duplicative recovery or complex apportionment of damages, and the existence of more direct victims of the alleged conspiracy—weigh heavily against judicial enforcement of the Union's antitrust claim. Accordingly, we hold that, based on the allegations of this complaint, the District

---

damages theories may, in certain limited circumstances, be considered in determining who is entitled to prosecute an action brought under § 4. . . . Thus we recognized that the task of disentangling overlapping damages claims is not lightly to be imposed upon potential antitrust litigants, or upon the judicial system."

[52] Although the policy against duplicative recoveries may not apply to the other type of harm asserted in the Union's brief—reduction in its ability to persuade nonunion contractors to enter into union agreements—the remote and obviously speculative character of that harm is plainly sufficient to place it beyond the reach of § 4. See n. 46, *supra.*

Court was correct in concluding that the Union is not a person injured by reason of a violation of the antitrust laws within the meaning of § 4 of the Clayton Act. The judgment of the Court of Appeals is reversed.

*It is so ordered.*

JUSTICE MARSHALL, dissenting.

Section 4 of the Clayton Act provides that a damages action may be brought under the antitrust laws by *"[a]ny person* who [has been] injured in his business or property by reason of *anything* forbidden in the antitrust laws." 15 U. S. C. § 15 (emphasis added). Despite the absence of an "articulable consideration of statutory policy" supporting the denial of standing, *Blue Shield of Virginia* v. *McCready,* 457 U. S. 465, 473 (1982), the Court today holds that the intended victim of a restraint of trade does not constitute a "person who [has been] injured in his business or property by reason of anything forbidden in the antitrust laws." Because I believe that this decision imposes an unwarranted judge-made limitation on the antitrust laws, I respectfully dissent.

Congress' adoption of the broad language of § 4 was not accidental. As this Court observed in *Pfizer Inc.* v. *India,* 434 U. S. 308, 312 (1978): "Congress used the phrase 'any person' intending it to have its naturally broad and inclusive meaning. There was no mention in the floor debates of any more restrictive definition." Only last Term we emphasized that the all-encompassing language of § 4 "reflects Congress' 'expansive remedial purpose' in enacting § 4: Congress sought to create a private enforcement mechanism that would deter violators and deprive them of the fruits of their illegal actions, and would provide ample compensation to the victims of antitrust violations." *Blue Shield of Virginia* v. *McCready, supra,* at 472, quoting *Pfizer Inc.* v. *India, supra,* at 313–314.

In keeping with the inclusive language and remedial purposes of § 4, this Court has "refused to engraft artificial limi-

tations on the §4 remedy." *Blue Shield of Virginia* v. *McCready, supra,* at 472 (footnote omitted).[1] Thus, for example, in *Pfizer Inc.* v. *India,* the Court held that the statutory phrase "any person" is broad enough to encompass a foreign sovereign. In *Reiter* v. *Sonotone Corp.,* 442 U. S. 330 (1979), the Court likewise adopted an expansive reading of the statutory term "property," ruling that a consumer who pays a higher price as a result of a price-fixing conspiracy has sustained an injury to his "property" and therefore has standing to sue under §4.

The plaintiff unions fit comfortably within the language of §4. The complaint alleges that plaintiffs suffered injury as a result of a restraint of trade that was "designed to weaken and destroy plaintiffs and each of them." Complaint ¶26. The Court does not suggest that a union is not a "person" within the meaning of §4, or that plaintiffs cannot prove injury to their "business or property." Moreover, it would require a strained reading of §4 to conclude that a party that an antitrust violation was aimed at cannot prove that it suffered injury "by reason of" an antitrust violation.

Far from supporting the Court's conclusion, *ante,* at 531–533, the common-law background of the antitrust laws highlights the anomaly of denying a remedy to the intended victim of unlawful conduct. Since antitrust violations are essentially "tortious acts," *Bigelow* v. *RKO Radio Pictures, Inc.,* 327 U. S. 251, 264 (1946),[2] the most apt analogy is to the common law of torts. Although many legal battles have been fought over the extent of tort liability for remote conse-

---

[1] Cf. *Radovich* v. *National Football League,* 352 U. S. 445, 453–454 (1957) (given Congress' determination that the activities prohibited by the antitrust laws are "injurious to the public" and its creation of "sanctions allowing private enforcement of the antitrust laws by an aggrieved party," "this Court should not add requirements to burden the private litigant beyond what is specifically set forth by Congress in those laws").

[2] See *Karseal Corp.* v. *Richfield Oil Corp.,* 221 F. 2d 358, 363 (CA9 1955) (antitrust action is basically a suit to recover "for a tort").

quences of *negligent* conduct, it has always been assumed that the victim of an *intentional* tort can recover from the tortfeasor if he proves that the tortious conduct was a cause-in-fact of his injuries. An inquiry into proximate cause has traditionally been deemed unnecessary in suits against intentional tortfeasors.[3] For example, if one party makes false representations to another, intending them to be communicated to a third party and acted upon to his detriment, the third party can bring an action for misrepresentation against the originator of the false information if he suffers injury as a result.[4] Indeed, in many situations the common law holds

---

[3] See Restatement of Torts § 279 (1934) ("If the actor's conduct is intended by him to bring about bodily harm to another which the actor is not privileged to inflict, it is the legal cause of any bodily harm of the type intended by him which it is a substantial factor in bringing about"); *id.*, Comment *c* ("There are no rules which relieve the actor from liability because of the manner in which his conduct has resulted in the injury such as there are where the liability of a negligent actor is in question. Therefore, the fact that the actor's conduct becomes effective in harm only through the intervention of new and independent forces for which the actor is not responsible is of no importance") (citations omitted); *id.*, § 280 (same rule applies to conduct intended to cause harm other than bodily harm); *Seidel* v. *Greenberg*, 108 N. J. Super. 248, 261–269, 260 A. 2d 863, 871–876 (1969); *Derosier* v. *New England Tel. & Tel. Co.*, 81 N. H. 451, 464, 130 A. 145, 152 (1925) ("For an intended injury the law is astute to discover even very remote causation").

The Court's reliance on Sutherland's treatise on damages is misplaced. *Ante*, at 532–533, n. 25. Although Sutherland stated as a general proposition that a defendant is not liable to a plaintiff for injuries suffered as a result of the defendant's conduct with respect to a third party, he distinguished cases in which "the wrongful act is willful for that purpose," by which he presumably meant cases in which the defendant intended to injure the plaintiff. 1 J. Sutherland, Law of Damages 55 (1882) (footnote omitted). In the examples given by Sutherland and cited by the Court, there is no suggestion that the defendants intended to inflict injury upon the plaintiffs.

[4] See, *e. g.*, *Watson* v. *Crandall*, 7 Mo. App. 233 (1879), aff'd, 78 Mo. 583 (1883); *Campbell* v. *Gooch*, 131 Kan. 456, 292 P. 752 (1930). See generally Prosser, Misrepresentation and Third Persons, 19 Vand. L. Rev. 231, 240–242 (1966).

an intentional tortfeasor liable even for the unforeseeable consequences of his conduct.[5]   I am not aware of any cases exonerating an intentional tortfeasor from responsibility for the intended consequences of his actions merely because he inflicted harm upon his victim indirectly rather than directly.

This case does not implicate the sort of "articulable consideration of statutory policy" which we have deemed necessary to deny standing to a party encompassed by the language of § 4.   *Blue Shield of Virginia* v. *McCready*, 457 U. S., at 473.   In *Brunswick Corp.* v. *Pueblo Bowl-O-Mat, Inc.*, 429 U. S. 477 (1977), we denied standing to parties that suffered injury because an illegal acquisition prevented them from reaping profits that they would have reaped had the acquired firms been permitted to fail.   We reasoned that permitting recovery for "the profits [plaintiffs] would have realized had competition been reduced" would be "inimical" to the purposes of the antitrust laws, *id.*, at 488, since plaintiffs' injuries did not "reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation," *id.*, at 489.   This consideration of statutory policy is not applicable here, for plaintiffs allege that they suffered injury as a result of the defendants' efforts to coerce and induce letters of construction contracts and others to deal with nonunion carpentry firms solely because of their nonunion status. If plaintiffs prove their allegations, they will prove that they suffered harm attributable to the anticompetitive consequences of the defendants' restraint of trade.

Nor does the present case implicate the consideration of statutory policy underlying this Court's decisions in *Illinois Brick Co.* v. *Illinois*, 431 U. S. 720 (1977), and *Hawaii* v. *Standard Oil Co.*, 405 U. S. 251 (1972).   Critical to the denial of standing in those cases was the risk of duplicative recovery that would have been created by affording the plain-

---

[5] See, *e. g.*, W. Prosser, Law of Torts 32–33 (4th ed. 1971) (doctrine of transferred intent); *id.*, at 67–68 (trespasser is responsible for unforeseeable consequences of his trespass).

tiffs standing.[6] In *Illinois Brick* the Court held that an indirect purchaser has no standing to sue a seller on the theory that overcharges paid to the seller by a direct purchaser were passed on to the indirect purchaser. 431 U. S., at 730–731. If the Court had held in *Illinois Brick* that the indirect purchaser has standing, sellers would have faced the prospect of two treble-damages actions based on the same overcharges. *Hanover Shoe, Inc.* v. *United Shoe Machinery Corp.*, 392 U. S. 481 (1968), had established that a direct purchaser can sue a seller for the entire amount of the seller's overcharges, and that the seller cannot assert as a defense that the direct purchaser passed the overcharges through to its customers (the indirect purchasers). Similarly, in *Hawaii* v. *Standard Oil Co.*, where the State of Hawaii sought to recover for financial harm allegedly suffered by the general economy of the State, the Court denied standing because "[a] large and ultimately indeterminable part of the injury to the 'general economy,' as it is measured by economists, is no more than a reflection of injuries to the 'business or property' of consumers, for which they may recover themselves under § 4." 405 U. S., at 264.[7]

There is no risk of double recovery here. The plaintiff unions seek recovery for injuries distinct from those that other parties may have suffered. One such distinct injury

---

[6] See *Blue Shield of Virginia* v. *McCready*, 457 U. S. 465, 474–475 (1982) (noting that *Illinois Brick* and *Hawaii* v. *Standard Oil Co.* "focused on the risk of duplicative recovery engendered by allowing every person along a chain of distribution to claim damages arising from a single transaction that violated the antitrust laws").

[7] Significantly, the risk of duplicative recovery that the Court relied on in both *Illinois Brick* and *Hawaii* v. *Standard Oil Co.* is not simply a judicially invented reason for restricting the broad scope of § 4. Permitting two recoveries based on the very same injuries would be contrary to the basic statutory scheme governing damages actions, for the result would be to subject antitrust defendants to sextuple-damages awards rather than the treble-damages awards that Congress contemplated. See 2 P. Areeda & D. Turner, Antitrust Law § 337d (1978).

plaintiffs may have suffered is a decrease in union dues resulting from a reduction in work available to union members. In addition to regular dues, it is not uncommon for employees to pay periodic dues representing a percentage of their wages. See R. Gorman, Basic Text on Labor Law 650 (1976).[8] If union members lost work as a result of the alleged restraint of trade, their wages and thus the dues collected by the plaintiff unions may have been reduced.

Any recovery of lost dues by the plaintiff unions would not duplicate recoveries that might be obtained by either unionized carpentry firms or employees of those firms. A recovery of lost dues by a union would not duplicate a recovery for lost profits that might be obtained by a firm for which union members worked, for union dues are not an element of a firm's profits. Nor would a recovery of lost dues by a union duplicate recoveries of lost wages that employees might obtain. Although periodic union dues are based on a percentage of wages, there would be no double recovery because union dues would be subtracted from lost wages in calculating the employees' damages. The *Hanover Shoe* rule barring the assertion of a "pass-through" defense would not prevent subtraction of union dues from wages in determining the employees' damages. The *Hanover Shoe* rule was designed to avoid the "additional long and complicated proceedings involving massive evidence and complicated theories" that would be required to determine the extent to which price overcharges were passed through to an indirect purchaser. 392 U. S., at 493. In sharp contrast, where union dues are a percentage of wages, there is no difficulty in determining the amount of dues that a union lost as a result of a reduction in the wages earned by union members.

---

[8] Since we have only the pleadings before us, we do not know how the plaintiff unions collect their dues. However, plaintiffs are entitled to survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) if there is any set of facts that, if proved at trial, would entitle them to recover.

I recognize that it may not be easy to ascertain to what extent any reduction in union dues was attributable to the defendants' conduct. But our cases make it clear that "[i]f there is sufficient evidence in the record to support an inference of causation, the ultimate conclusion as to what the evidence proves is for the jury." *Perkins* v. *Standard Oil Co.*, 395 U. S. 642, 648 (1969) (reinstating jury verdict based on injury indirectly caused by price discrimination in violation of the Robinson-Patman Act). Insofar as the amount of damages is concerned, an antitrust plaintiff need only provide a reasonable estimate of the damages stemming from an antitrust violation. See *Bigelow* v. *RKO Radio Pictures, Inc.*, 327 U. S., at 266. "'Difficulty of ascertainment is no longer confused with right of recovery,'" *id.*, at 265, quoting *Story Parchment Co.* v. *Paterson Co.*, 282 U. S. 555, 566 (1931), and "[t]he most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created," 327 U. S., at 265.

Any concern the Court may have that the plaintiffs cannot prove their case does not justify throwing them out of court solely on the basis of the pleadings. If, during discovery, it becomes apparent that plaintiffs cannot establish a reasonable inference of causation or cannot provide evidence supporting a rational estimate of damages, they will be vulnerable to a motion for summary judgment. Dismissal for failure to state a claim is too crude a procedural device to be used to vindicate the "interest . . . in keeping the scope of complex antitrust trials within judicially manageable limits." *Ante,* at 543.