**DRUG MART PHARMACY, et al., Plaintiffs,**

v.

**AMERICAN HOME PRODUCTS, et al., Defendants.**

**No. 93 CV 5148(ILG)(SG).**

United States District Court, E.D. New York.

Dec. 22, 2003.

Mary McInnis Boies, Mary Boise & Associates, Bedford, NY, William Duker, Boies Schiller & Flexner LLP, New York City, for Plaintiffs.

Michael J. Gallagher, Richard J. Holwell, Robert A. Milne, White & Case, Wayne A. Cross, Dewey Ballantine LLP, New York City, John W. Nields, Jr., Howrey, Simon, Arnold & White, LLP, Marguerite S. Boyd, William L. Webber, Howrey & Simmon, Washington, DC, Mark S. Stewart, Ballard Spahr Andrews & Ingersoll, LLP, Philadelphia, PA, James C. Egan, Clifford Chance USLLP, Washington, DC, Paul E. Slater, Sperling E. Slater, P.C., Chicago, IL, for Defendants.

## MEMORANDUM AND ORDER

GLASSER, District Judge.

The defendant manufacturers have moved this Court for an Order that would grant them partial summary judgment dismissing the claims of the plaintiffs represented by the firm of Boies, Schiller and Flexner, LLP ("the plaintiffs"), seeking damages for lost profits on sales of Brand Name Prescription Drugs ("BNPDs") they forewent and lost profits on the sales of ancillary products they forewent, and special damages all in addition to overcharge damages. The special damages they seek would be those sustained by some plaintiffs who allegedly were forced to give up their businesses because of the overcharges exacted by the manufacturers for BNPDs.

This suit is in sight of a conclusion after more than ten years of protracted litigation spawning numerous decision in which the resolution of vigorously contested issues have been memorialized.

The procedural and substantive background of this litigation has been described at length in those decisions familiarity with which is assumed, excepting one.

In a decision of this Court dated August 21, 2002, partial summary judgment was granted to the defendant manufacturers holding that the claims of the Boise plaintiffs for "lost profits" attributable to sales of BNPDs they purchased from wholesalers were barred by *Illinois Brick v. Illinois*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977). Although refraining from deciding then the lost profits and other claims that are at issue in this motion because they were not before me for decision, I ignored Sir Francis Bacon's injunction that an overspeaking judge is no well-tuned cymbal[1] and gratuitously opined that those claims would "appear to be barred by *Illinois Brick* because such damages seem incident to, and seem to necessarily flow from, the manufacturer defendants' alleged 'overcharge' to the wholesalers." *Drug Mart Pharmacy Corp. v. American Home Products Corp.*, 2002 WL 31528625 *11 (E.D.N.Y.2002). The validity of that gratuitously offered opinion must now be determined.

The issue is best framed, perhaps, by an understanding of the respective views of the parties. The defendants' view is that the plaintiffs' damages are limited by *Illinois Brick* to the overcharge for BNPDs attributable to their alleged conspiracy for the reason that their other damage claims require the precise incidence analysis *Illinois Brick* rejected. The plaintiffs' view is that "There is no case that has applied *Illinois Brick* to anything but an indirect purchaser context." Transcript of hearing on November 18,2003 at 35–36 ("Tr.") and that they are entitled to recover the amount of the overcharge for the BNPDs in addition to the profits they lost on the sales of BNPDs, the profits they lost on the sales of ancillary products such as

---

1. Francis Bacon, *Judicature* in Essays (J.M. Dent & Sons) 162–63 (1958).

toothpaste, bandaids, cosmetics, etc. and special damages (Tr. at 19, 23, 34–36).

## Discussion

Research has revealed no case in which damages were sought and awarded for both overcharges, lost profits and other collateral harms allegedly suffered by an antitrust plaintiff nor has either party called one to the attention of the Court which addresses the question one way or the other.

A literal reading of II Areeda and Havenkamp, Antitrust Law, ¶ 394 (2d ed.2000) would suggest that the plaintiffs' remedy is either the overcharges or the lost profits. The authors write at p. 521: "Antitrust plaintiffs may complain about overcharges—prices that are higher than they would otherwise be—.... An immediate question is what the measure of damages should be in an overcharge case. There are two *alternatives:* (1) lost profits and (2) the overcharge" [which are] "not economically equivalent." (emphasis added). That the measure of damages is in the alternative is reflected later on in that paragraph at p. 522 as follows: "The most accurate measure of the damages actually sustained is lost profit, but this will usually lead to smaller recoveries and therefore is *not apt to be selected* by plaintiffs." And in ¶ 394(b) at p. 529: "In spite of the (arguably) theoretical superiority of lost profits as a measure of damages in a price-enhancement case, nearly all plaintiffs claim damages on the basis of an overcharge calculation."

If the reading of that treatise is regarded as too literal and even, perhaps, somewhat anecdotal to serve as the confident basis for deciding the issue resort will then be had to the cases.

From the very inception of this litigation it has been the gravamen of the plaintiffs' claim that they have been overcharged by the manufacturer defendants of BNPDs.

*Illinois Brick* was at the core of virtually every dispositive opinion issued thus far.

The right of an antitrust plaintiff to recover the overcharges he was required to pay was recognized long ago in *Chattanooga Foundry & Pipe Works v. City of Atlanta,* 203 U.S. 390, 27 S.Ct. 65, 51 L.Ed. 241 (1906) (Holmes, J.) ("[W]here a man is made poorer by an extravagant bill .... We do not go behind the person of the sufferer. *We say that he has been defrauded or subjected to duress, ... and stop there.*") (emphasis added). *Chattanooga Foundry,* stopping with the sufferer, presaged the "passing on" issue for which *Hanover Shoe, Inc. v. United Shoe Machinery Corp.,* 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968) and *Illinois Brick* have become synonymous, but which was also addressed much earlier in *Southern Pac. Co. v. Darnell–Taenzer Lumber Co.,* 245 U.S. 531, 38 S.Ct. 186, 62 L.Ed. 451 (1918) (Holmes, J.). In that case, the lumber company sued the railroads for charging rates that were excessive. The only question before the Court was "whether the fact that the plaintiffs were able to pass on the damage that they sustained in the first instance by paying the unreasonable charge, and to collect that amount from the purchasers, prevents their recovering the overpayment from the carriers." The answer, said Justice Holmes, echoing what he wrote for the Court in *Chattanooga Foundry* "is not difficult. The general tendency of the law, in regard to damages at least, is not to go beyond the first step," 245 U.S. at 533, 38 S.Ct. 186. That is to say, to "stop there." Continuing, he wrote: "As it does not attribute remote consequences to a defendant so it holds him liable if proximately the plaintiff has suffered a loss. The plaintiffs suffered losses to the amount of the verdict [the overcharge] when they paid. *Their claim accrued at once in the theory of the law and it does not inquire*

*into later events."* (emphasis mine). 245 U.S. at 533–34, 38 S.Ct. 186. That, I would suggest is Occam's Razor response to the incidence analysis—tracing the overcharge through successive sales—that plaintiffs' damages claims would necessarily entail.

In *Straus et al. v. Victor Talking Mach. Co.,* 297 F. 791 (2d Cir.1924), a case factually related to this one, the defendant ("Victor") marketed its patented products through sales contacts with its distributors and dealers which regulated the prices at which its product s were resold to dealers and by them to the public and also prescribed the persons who were entitled to be dealers and receive discounts. The plaintiff (hereafter "Macy's") contracted with the distributor (some of whom were named as defendants) which gave Macy's the right to purchase from them Victor's goods at a discount of 40 and 10 percent from Victor's list price, plus 2 percent for cash, if paid within 10 days and Macy's, as a dealer, was obligated to sell to the public at list prices fixed by Victor. For reasons not relevant to detail, Macy's was precluded from receiving Victor's goods at dealer's discounts and was unable to purchase them from Victor distributors. Those distributors were prohibited from selling to Macy's at less than the full retail price without risking being eliminated as a Victor distributor.

Thereafter, when a Macy's customer wanted to purchase a Victor record, Macy's went out and bought one at full retail price for delivery to its customer. The damages plaintiff sought to recover was not lost profit. Their claim was that they were prevented from buying Victor's goods in a free market by Victor's illegal combination and were thus forced to pay more for their goods than the fair and reasonable market price which the defendants themselves established. The Court wrote, at 297 F. at 803 as follows:

The plaintiffs contend, and rightly, that they were not forced to sue for damages for lost profits, and thus run the risk of no recovery, because, plainly the restrictive arrangement prior to May 1, 1914, furnished no standard of comparison with sales made or profits increased or lost, by plaintiffs during the period thereafter, when they could sell as they pleased. They contended for a rule of damage which seeks the proximate cause of damage and the proximate result occasioned by that cause.

And then, after quoting Justice Holmes in *Darnell–Taenzer Lumber* that "The general tendency of the law, in regard to damages, at least, is not to go beyond the first step." The Court continued:

Plaintiffs were compelled to pay more than the reasonable price. Why? Manifestly because the illegal combination forced them so to do in order to carry on the requirements of their business. *Whether, then, plaintiffs sold to their customers at a profit or loss becomes immaterial in this case.* (emphases added).

*See also Atlantic City Electric Company, et al., v. General Electric Company, et al.,* 226 F. Supp. 59 (S.D.N.Y.1964), appeal denied, 337 F.2d 844 (2d Cir.1964).

*Hanover Shoe, Inc. v. United Shoe Machinery Corp.,* 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968) presented the Court with the question whether *United* could defend against *Hanover's* claim of overcharge by showing that *Hanover* passed on to its customers the amount of the overcharge, and thus suffered no loss from the overcharge. The Court held that the defense was not available to *United.* Justice Holmes' view reflected in *Chattanooga Foundry* and *Darnell–Taenzer Lumber* was acknowledged by the Court as was Judge Feinberg's decision in *Atlantic City Electric,* but in so holding, the Court, in its discussion, went beyond "the

first step," explaining why that was the appropriate place to stop, writing at 392 U.S. at 492, 88 S.Ct. 2224:

> We are not impressed with the argument that sound laws of economics require recognizing this defense. A wide range of factors influence a company's pricing policies. Normally the impact of a single change in the relevant conditions cannot be measured after the fact; indeed a businessman may be unable to state whether, had one fact been different (a single supply less expensive, general economic conditions more buoyant, or the labor market tighter, for example), he would have chosen a different price. Equally difficult to determine, in the real economic world rather than an economist's hypothetical model, is what effect a change in a company's price will have on its total sales. Finally, costs per unit for a different volume of total sales are hard to estimate. Even if it could be shown that the buyer raised his price in response to, and in the amount of, the overcharge and that his margin of profit and total sales had not thereafter declined, there would remain the nearly insuperable difficulty of demonstrating that the particular plaintiff could not or would not have raised his prices absent the overcharge or maintained the higher price had the overcharge been discontinued. Since establishing the applicability of the passing on defense would require a convincing showing of each of those virtually unascertainable figures, the task would normally prove insurmountable. On the other hand it is not unlikely that if the existence of the defense is generally confirmed, antitrust defendants will frequently seek to establish its applicability. Treble-damage actions would often require additional long and complicated proceedings involving massive evidence and complicated theories.

> \*    \*    \*    \*    \*    \*

Our conclusion is that Hanover proved injury and the amount of its damages for the purpose of its treble-damage suit when it proved that *United* had overcharged it during the damage period and showed the amount of the overcharge.

Almost 9 years to the day later, Justice White, who wrote for the Court in *Hanover Shoe*, wrote again for the Court in *Illinois Brick Company v. State of Illinois*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977). The facts in that case were essentially these. The petitioners make and sell concrete block to masonry contractors who submit bids to general contractors who, in turn, submit bids to the respondent and other governmental entities for construction projects. The respondents seek antitrust treble damages alleging an overcharge for the concrete block caused by a price-fixing conspiracy. That alleged overcharge could only have injured the respondents if all or part of it was passed on to them by the masonry and general contractors instead of being absorbed by them. The Court framed the issue presented as follows: "Having decided [in *Hanover Shoe*] that in general a pass-on theory may not be used defensively by an antitrust violator against a direct purchaser plaintiff, we must now decide whether that theory may be used offensively by an indirect purchaser plaintiff against an alleged violator." 431 U.S. at 726, 97 S.Ct. 2061.

In holding that it may not, the Court reached that result in two steps: "First, we conclude that whatever rule is to be adopted regarding pass-on in antitrust damages actions, it must apply equally to plaintiffs and defendants ... Second, we decline to abandon the construction given § 4 in Hanover Shoe that the overcharged direct purchaser, and not others in the

chain of manufacture or distribution is the party 'injured in his business or property' within the meaning of the section in the absence of a convincing demonstration that the Court was wrong in Hanover Shoe to think that the effectiveness of the antitrust treble-damages action would be substantially reduced by adopting a rule that any party in the chain may sue to recover the fraction of the overcharge allegedly absorbed by it." 431 U.S. at 728–29, 97 S.Ct. 2061.

In buttressing its view that *Hanover Shoe* must be applied equally to plaintiffs and defendants as regards the permissibility of pass-on arguments, the Court wrote:

> The principal basis for the decision in Hanover Shoe was the Court's perception of the uncertainties and difficulties in analyzing price and out-put decisions 'in the real economic world rather than an economist's hypothetical model' and of the costs to the judicial system and the efficient enforcement of the antitrust laws of attempting to reconstruct those decisions in the courtroom. This perception that the attempt to trace the complex economic adjustments to a change in the cost of a particular factor of production would greatly complicate and reduce the effectiveness of already protracted treble-damage proceedings applies with no less force to the assertion of pass-on theories by plaintiffs than it does to the assertion by defendants.

431 U.S. at 731–32, 97 S.Ct. 2061 (internal citation omitted).

The inherent and unassailable merit of Justice Holmes' prescience in *Chattanooga Foundry* and *Darnell–Taenzer, supra,* lies in his recognition that in regard to damages at least, the "general tendency of the law is not to go beyond the first step [a]s it does not attribute remote consequences to

a defendant ...." The plaintiffs' loss was the amount of the overcharge, a claim that accrued when they paid it and the law "does not inquire into later events." His exquisitely succinct pronouncement finds its echo in other legal formulations such as: damages cannot be awarded on the basis of speculation and surmise or the limitations imposed upon liability by the principles of proximate cause. As regards the latter, *Associated General Contractors of California v. California State Council of Carpenters*, 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983) is instructive. The union, in that case, sued the contractor's association charging it with a conspiracy to restrain the union's business activities in violation of the Sherman Act. The Court agreed with the District Court's dismissal of the claim and disagreed with the reverse of that dismissal by the Ninth Circuit Court of Appeals. In the course of its opinion the Court, referring to § 4 of the Clayton Act's provision that "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefore ... without respect to the amount in controversy, and shall recover threefold the damages by him sustained ....," observed that "A literal reading of the statute is broad enough to encompass every harm that can be attributed directly or indirectly to the consequences of an antitrust violation." 459 U.S. at 529, 103 S.Ct. 897.

A review of the legislative history of the statute, however, led the Court to conclude that Congress did not intend it to have such an open-ended meaning. The debates that preceded the enactment of the statute made "it clear that Congress intended the Act to be construed in the light of its common law background." 459 U.S. at 531, 103 S.Ct. 897. The principles of proximate cause[2] are deeply imbedded in

---

**2.** The reluctance of the courts to joust with     philosophers on the field of causation and the

that background and are reflected in Justice Holmes' limitation of damages as not going "beyond the first step" and Justice Brennan's acknowledgment in his *Illinois Brick* dissent that "despite the broad wording of § 4 there is a point beyond which the wrongdoer should not be held liable."

The law's admonition to avoid the imposition of damages based upon speculation or conjecture is endorsed obliquely, if not directly, in Justice White's words in *Illinois Brick* as follows:

> More important, as the Hanover Shoe Court observed, 392 U.S. at 493, 88 S.Ct. at 2231, "in the real economic world rather than an economist's hypothetical model," the latter's drastic simplifications generally must be abandoned. Overcharged direct purchasers often sell in imperfectly competitive markets. They often compete with other sellers that have not been subject to the overcharge; and their pricing policies often cannot be explained solely by the convenient assumption of profit maximization. As we concluded in *Hanover Shoe*, 392 U.S. at 492, 88 S.Ct. at 2231, attention to "sound laws of economics' can only heighten the awareness of the difficulties and uncertainties involved in determining how the relevant market varia-

bles would have behaved had there been no overcharge." (footnotes omitted).

The unavoidable difficulties of speculation and causality which are the DNA of incidence analysis and the *sina qua non* for its rejection compelled the judicial recognition that the legislative purpose in the enforcement of the antitrust laws is better served by deciding that direct purchasers are injured to the full extent of the overcharge paid by them.

For all of the reasons heretofore discussed, the Court is driven to conclude that the manufacturer defendants' motion for partial summary judgment is to be granted, and that the plaintiffs' claim for damages is measured by the amount of the overcharge attributable to the alleged conspiracy and accrued when they paid it and that is the step beyond which the law will not go.

SO ORDERED.

---

practical judicial necessity of not going "beyond the first step" is perhaps graphically conveyed in footnote 32 at 459 U.S. at 537, 103 S.Ct. 897 in which Professor Leon Green, the most prolific and respected scholar on proximate cause is cited as having written in his *Rationale of Proximate Cause*, 135–36 (1927) as follows:

> 'Cause,' although irreducible in its concept, could not escape the ruffles and decorations so generously bestowed: remote, proximate, direct, immediate, adequate, efficient, operative, inducing, moving, active, real, effective, decisive, supervening, primary, original, contributory, ultimate, concurrent, causa causans, legal, responsible, dominating, natural, probable, and others. The dif-

ficulty now is in getting any one to believe that so simple a creature could have been so extravagantly garbed.

*See also* the extensive quote from Leon Green, Judge and Jury (1930) in *Hentschel v. Baby Bathinette Corp.*, 215 F.2d 102, 109 n. 9 (2d Cir.1954) and Judge Andrews' dissent in the celebrated *Palsgraf v. Long Island R.R. Co.*, 248 N.Y. 339 at 351–52, 162 N.E. 99 (1928):

> What is a cause in a legal sense, still more what is a proximate case, depend in each case upon many considerations .... What we do mean by the word 'proximate' is, that because of convenience, of public policy, of a rough sense of justice, the law arbitrarily declines to trace a series of events beyond a certain point.