**In re CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION.**

**This document relates to All Actions.**

**Master File No. CV–07–5944 SC. MDL No. 1917.**

United States District Court, N.D. California.

March 30, 2010.

Gilmur Roderick Murray, Murray & Howard, LLP, Geoffrey Conrad Rushing, Richard Alexander Saveri, Gianna Christa Gruenwald, Cadio R. Zirpoli, Guido Saveri, David Nathan–Allen Sims, Saveri & Saveri, Inc., Lauren Clare Russell, Trump, Alioto, Trump & Prescott, LLP, Jonathan Mark Watkins, Jessica L. Grant, Esther L. Klisura, Bruce Lee Simon, Ashlei Melissa Vargas, Pearson Simon Warshaw Penny LLP, Lori Erin Andrus, Jennie Lee Anderson, Andrus Anderson LLP, Qianwei Fu, Patrick Bradford Clayton, Craig C. Corbitt, Francis Onofrei Scarpulla, Judith A. Zahid, Zelle Hofmann Voelbel & Mason LLP, Mario Nunzio Alioto, Trump Alioto Trump & Prescott LLP, Matthew Rutledge Schultz, Gonzalez & Leigh, LLP, Joseph Mario Patane, Law Office of Joseph M. Patane, Kenneth Leo Valinoti, Valinoti & Dito LLP, Terry Gross, Gross & Belsky LLP, Joseph M. Alioto, Sr., Theresa Driscoll Moore, Angelina Alioto–Grace, Joseph Michelangelo Alioto, Jr., Alioto Law Firm, Susan Gilah Kupfer, Glancy Binkow & Goldberg LLP, Allan Steyer, Donald Scott Macrae, Henry A. Cirillo, Jayne Ann Peeters, Steyer Lowenthal Boodrookas Alvarez & Smith LLP, San Francisco, CA, Daniel D. Owen, Christopher Wilson, Patrick John Brady, Polsinelli Shughart PC, Kansas City, MO, Clifford H. Pearson, Daniel L. Warshaw, Pearson,

Simon, Warshaw & Penny LLP, Sherman Oaks, CA, Steven Alan Reiss, David L. Yohai, Weil, Gotshal, & Manges, LLP, Lawrence D. McCabe, Murray Frank & Sailer LLP, Gregory Keith Arenson, Robert N. Kaplan, Kaplan Kilsheimer & Fox LLP, Linda Phyllis Nussbaum, Grant & Eisenhofer P.A., Linda P. Nussbaum, Kaplan Fox & Kilsheimer, LLP, Elizabeth Anne McKenna, Paul F. Novak, Andrew J. Morganti, Peter G.A. Safirstein, Milberg LLP, New York, NY, Shpetim Ademi, Guri Ademi, Ademi & O'Reilly LLP, Cudahy, WI, Jayne A. Goldstein, Mager & Goldstein LLP, Jayne Arnold Goldstein, Shepherd, Finkelman, Miller & Shah, LLP, Weston, FL, Clinton Paul Walker, Fred A. Silva, Kathy Lee Monday, Roger Martin Schrimp, Damrell, Nelson, Schrimp, Pallios, Pacher & Silva, Betty Lisa Julian, Modesto, CA, Steven Noel Williams, Joseph W. Cotchett, Neil Swartzberg, Cotchett Pitre & McCarthy, Burlingame, CA, Randy R. Renick, Hadsell Stormer Keeny Richardson & Renick, Pasadena, CA, Richard M. Hagstrom, Michael Jacobs, Zelle Hofmann Voelbel Mason & Gette LLP, Seymour J. Mansfield, Jean B. Roth, Lawrence P. Schaefer, Mansfield Tanick & Cohen, Jason Kilene, Minneapolis, MN, John G. Emerson, Emerson Poynter LLP, Houston, TX, Bryan L. Clobes, Cafferty Faucher LLP, Lee Albert, Mager & Goldstein LLP, Eugene A. Spector, William G. Caldes, Spector, Roseman, Kodroff & Willis, P.C., Anthony J. Bolognese, Joshua H. Grabar, Bolognese & Associates, LLC, Philadelphia, PA, James E. Cecchi, Lindsey H. Taylor, Carella Byrne Bain Gilfillan Cecchi Stewart & Olstein PC, Roseland, NJ, Marisa C. Livesay, San Diego, CA, James McManis, Marwa Elzankaly, McManis Faulkner, San Jose, CA, Joel Flom, Jeffries Olson & Flom PA, Fargo, ND, Lawrence Genaro Papale, Law Offices of Lawrence G. Papale, St. Helena, CA, M. Eric Frankovitch, Michael G. Simon, Frankovitch Anetakis Colantonio & Simon, Weirton, WV, Robert B. Gerard, Gerard Selden & Osuch, Las Vegas, NV, Sherman Kassof, Law Offices of Sherman Kassof, Lafayette, CA, Daniel R. Karon, Goldman Scarlato and Karon, PC, Drew A. Carson, Steven J. Miller, Miller Goler Faeges, Cleveland, OH, Mary Gilmore Kirkpatrick, Kirkpatrick & Goldborough PLLC, South Burlington, VT, Robert James Pohlman, Ryley Carlock & Applewhite PC, Phoenix, AZ, Kathleen Styles Rogers, San Mateo, CA, Garrett D. Blanchfield, Jr., Mark Reinhardt, Reinhardt Wendorf & Blanchfield, St. Paul, MN, Charles H. Johnson, Charles H. Johnson & Associates PA, Neal A. Eisenbraun, Neal A. Eisenbraun, Chartered, New Brighton, MN, Robert J. Bonsignore, Bonsignore & Brewer, Medford, MA, Donna F. Solen, Donna F. Solen, Mason Law Firm, Steven F. Benz, Kellogg, Huber, Hansen, Todd, Washington, DC, Issac L. Diel, Sharp McQueen, Overland Park, KS, Gary Laurence Specks, Kaplan Fox & Kilsheimer LLP, Highland Park, IL, Krishna B. Narine, Schiffrin & Barroway, LLP, Bala Cynwyd, PA, Joseph Michael Vanek, Vanek, Vickers & Masini, P.C., David Paul Germaine, Chicago, IL, Linda P. Nussbaum, Nussbaum LLP, Scarsdale, NY, Kevin Bruce Love, Hanzman Criden & Love, P.A., South Miami, FL, Jeff S. Westerman, Milberg LLP, Los Angeles, CA, Lisa J. Rodriguez, Trujillo Rodriguez & Richards LLP, Haddonfield, NJ, Christina Diane Crow, Jinks, Crow & Dickson P.C., Union Springs, AL, J. Matthew Stephens, James Michael Terrell, Robert G. Methvin, Robert Gordon Methvin, Jr, McCallum Methvin & Terrell PC, Keith Thomson Belt, Jr., Belt Law Firm, P.C., Richard Freeman Horsley, King, Horsley & Lyons, Christopher William Cantrell, Birmingham, AL, Robert Brent Irby, Eric D. Hoaglund, McCallum, Hoaguland Cook & Irby LLP, Vestavia Hills, AL, Betsy Carol Manifold, Francis M. Gregorek, Mary Jane

Fait, Rachele R. Rickert, Wolf Haldenstein Adler Freeman & Herz LLP, Lynn W. Jinks, Nathan A. Dickson, Jinks Crow & Dickson PC, for Plaintiffs.

Joel Steven Sanders, Rachel S. Brass, Gibson Dunn & Crutcher LLP, Diane Leslie Webb, Michelle Park Chiu, Christine S. Safreno, Jason Bruce Allen, Jonathan Degooyer, Rebecca Ann Falk, Thomas R. Green, Kent Michael Roger, Morgan Lewis & Bockius LLP, Samuel R. Miller, Marie L. Fiala, Robert Brooks Martin, III, Ryan M. Sandrock, Sidley Austin LLP, Beth Harrison Parker, Bingham McCutchen LLP, Bruce H. Jackson, Nancy Chung Allred, Robert Walter Tarun, Baker & McKenzie LLP, Michael Frederick Tubach, O'Melveny & Myers LLP, Kris Hue Chau Man, Molly Donovan, Dewey & Leboeuf LLP, James Landon McGinnis, Michael W. Scarborough, Sheppard Mullin Richter & Hampton LLP, San Francisco, CA, D. Eric Shapland, John David Lombardo, Nana Little, Ronald Charles Redcay, Arnold & Porter LLP, Los Angeles, CA, Eva W. Cole, Kris Hue Chau Man, A. Paul Victor, Jeffrey L. Kessler, Molly Donovan, Dewey & Leboeuf LLP, David E. Yolkut, Steven A. Reiss, Weil Gotshal and Manges LLP, New York, NY, Andrew R. Tillman, Paine Tarwater Bickers & Tillman, Knoxville, TN, Gregory Hull, Joseph Richard Wetzel, Weil, Gotshal & Manges, LLP, Redwood Shores, CA, Margaret Anne Keane, Dewey & Leboeuf LLP, East Palo Alto, CA, Bijal Vijay Vakil, White & Case LLP, Palo Alto, CA, George L. Paul, Christopher M. Curran, Lucius B. Lau, Dana E. Foster, White & Case LLP, Terry Calvani, Bruce C. McCulloch, Christine A. Laciak, Freshfields Bruckhaus Deringer U.S. LLP, Kate S. McMillan, Ian T. Simmons, Anton Metlitsky, Haidee L. Schwartz, O'Melveny & Myers LLP, Washington, DC, Karen Sewell, Patrick J. Ahern, Roxane Busey, Baker & McKenzie LLP, Chicago, IL, Bernadette Shawan Gillians, William C. Cleveland, Buist Moore Smythe and McGee, Charleston, SC, for Defendants.

Gary L. Halling, Sheppard Mullin Richter & Hampton LLP, San Francisco, CA, for Plaintiffs/Defendants.

*ORDER APPROVING AND ADOPTING SPECIAL MASTER'S REPORT, RECOMMENDATIONS AND TENTATIVE RULINGS RE: DEFENDANTS' MOTIONS TO DISMISS*

SAMUEL CONTI, District Judge.

## I. INTRODUCTION

On February 5, 2010, the Special Master in the above matter rendered his Report, Recommendations, and Tentative Rulings Regarding Defendants' Motions to Dismiss. Docket No. 597 ("Report"). Defendants have filed objections, Docket Nos. 605, 607, 608, 610, 611, 612, 613, 614, 616, 617, 618, 619, 620, 622, and Plaintiffs have responded, Docket Nos. 626, 627, 628, 629, 630, 631, 632, 633, 634, 635, 636, 637, 638, 639, 640, 641. The Court held a hearing on Defendants' objections on March 18, 2010. Having considered the parties' filings and contentions, the Court hereby APPROVES and ADOPTS the Special Master's rulings and recommendations.

## II. BACKGROUND

This case concerns alleged conspiracies in the Cathode Ray Tube ("CRT") industry. On June 16, 2008, the Court appointed the Honorable Charles A. Legge, United States District Court Judge (Retired), as a Special Master to assist the Court in this litigation. Docket No. 302 ("Order Appointing Special Master"). On March 16, 2009, Direct Purchaser Plaintiffs filed a Consolidated Amended Complaint. Docket No. 436 ("Direct Compl."). Indirect Purchaser Plaintiffs filed a Consolidated Amended Complaint on the same day. Docket No. 437 ("Indirect Compl."). The

Special Master reviewed Defendants' joint and individual motions to dismiss, conducted a hearing on the motions to dismiss on October 5, 2009, and issued his Report on February 5, 2010.

### III. *LEGAL STANDARD*

Federal Rule of Civil Procedure 53 requires that in acting on a Special Master's Report, "the court must give the parties notice and an opportunity to be heard." Fed.R.Civ.P. 53(f)(1). The parties stipulated that the Court would "review findings of fact made or recommended by the Special Master for clear error" and "review *de novo* any conclusions of law." Order Appointing Special Master ¶ 18 (emphasis in original).

### III. *DISCUSSION*

#### A. *Standard of Review*

Most of the Special Master's recommendations are conclusions of law that the Court will review de novo. The first recommendation appears to rest on a finding of fact; namely, that the relevant products alleged in the complaints are CRTs and CRT Products. Report at 3–7, 33. However, out of an abundance of caution, the Court reviews all of Judge Legge's recommendations de novo.

#### B. *Relevant Products*

Judge Legge recommends that both the Direct Complaint and the Indirect Complaint allege conspiracies regarding both CRTs and CRT Products. Report at 3–7. Having reviewed both complaints, the Court agrees with the Special Master. Both complaints contain numerous allega-

tions concerning both CRTs and the products into which CRTs are incorporated; namely, televisions and computer monitors.

With regard to the Direct Complaint, there can be no doubt that the Direct Purchaser Plaintiffs are alleging conspiracies regarding both CRTs and CRT Products. "CRT Products" is defined by the Direct Purchasers as including color display tube products and color picture tube products. Direct Compl. ¶ 1. Color display tubes are the CRTs used in computer monitors, and color picture tubes are the CRTs used in televisions. *Id.* Plaintiffs allege they bought CRT Products. *Id.* ¶¶ 11–23. The class allegations encompass CRT Products. *Id.* ¶¶ 85–92. The trade and commerce allegations mention CRT Products. *Id.* ¶¶ 96, 97. The allegations regarding collusive meetings refer to CRT Products. *Id.* ¶¶ 134–53. Indeed, according to the Direct Purchaser Plaintiffs, CRT Products are mentioned 135 times in the Direct Complaint. Docket No. 633 ("Opposition to Joint Objections") at 8.

The Indirect Complaint is also replete with allegations –3–concerning both CRT and CRT Products. The very first paragraph alleges that "during the class period the Defendants conspired to fix, raise, maintain, and/or stabilize prices of CRT Products sold in the United States." Indirect Compl. ¶ 1. CRT Products are defined by the Indirect Purchasers to include "(a) CRTs; and (b) products containing CRTs, such as television sets and computer monitors." [1] *Id.* ¶ 15. The Indirect Purchaser Plaintiffs allege they purchased CRT Products from one or more of the Defen-

---

**1.** The Court acknowledges that this definition in the Indirect Complaint is somewhat vague, since references to "CRT Products" include both CRTs and the finished products into which they are incorporated. Nonetheless, and as explained below, the Court agrees with Judge Legge that the complaints contain suffi-

cient allegations of a conspiracy to fix prices of both CRTs and the products into which they are incorporated. Whether Plaintiffs will be able to prove their allegations is a question for a later stage of these proceedings.

dants. *Id.* ¶¶ 19–49. The Indirect Purchaser Plaintiffs allege a relationship between CRTs and the products into which CRTs are incorporated such that Defendants were often able to pass through the higher prices for CRTs to consumers. *Id.* ¶¶ 222–39. The Court concludes that both complaints allege conspiracies regarding both CRTs and the products into which CRTs are incorporated.

### C. *Objections Based on Pleading Standards*

Judge Legge considered whether the complaints contain enough factual allegations to give rise to plausible conspiracy claims regarding both CRTs and CRT Products against these Defendants. Report at 7–11. Judge Legge recommended that the Court deny the motions to dismiss based on the pleading standards articulated by the Supreme Court in *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), and *Ashcroft v. Iqbal,* —— U.S. ——, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). The Court agrees with Judge Legge's recommendation.

■ To survive a motion to dismiss for failure to state a claim, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Twombly,* 550 U.S. at 570, 127 S.Ct. 1955. "Specific facts are not necessary; the statement need only give the defendant[s] fair notice of what ... the claim is and the grounds upon which it rests." *Erickson v. Pardus,* 551 U.S. 89, 93, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) (internal quotation marks omitted). "Determining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal,* 129 S.Ct. at 1950. In *Twombly,* an antitrust case, the Supreme Court noted that:

Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of illegal agreement.... [A]n allegation of parallel conduct and a bare assertion of conspiracy will not suffice.

550 U.S. at 556, 127 S.Ct. 1955.

■ Here, the Court finds that both complaints contain sufficient factual allegations to give rise to plausible conspiracy claims regarding both CRTs and CRT Products. Both complaints allege that on February 10, 2009, a federal grand jury indicted C.Y. Lin, former Chairman and CEO of Defendant Chunghwa Picture Tubes, Ltd. ("Chunghwa"), for participating in a conspiracy to fix the price of CRTs. Direct Compl. ¶ 126; Indirect Compl. ¶ 205. When announcing the indictment, the Acting Assistant Attorney General in charge of the Antitrust Division suggested the conspiracy extended beyond CRTs themselves: "This conspiracy harmed countless Americans who purchased computers and televisions using cathode ray tubes sold at fixed prices." *Id.* Both complaints note that foreign antitrust enforcement authorities are investigating whether there was price-fixing in the CRT market. Direct Compl. ¶¶ 127–33; Indirect Compl. ¶¶ 206–13.

Direct Purchaser Plaintiffs allege that the conspiracy was effectuated through agreements and common understandings reached in at least 500 meeting between 1995 and 2007. Direct Compl. ¶ 134. It is alleged that the meetings became more organized in 1997, when they became known as "Glass Meetings." *Id.* ¶ 137. The Direct Complaint explains the structure and typical pattern of the meetings, some of which were attended by individuals at the highest level of Defendants' com-

panies, and some of which allegedly occurred on golf courses. *Id.* ¶¶ 138–53. It is alleged that Defendants or their agents agreed to fix prices, exchange information, coordinate public statements regarding capacity and supply, keep meetings secret, allocate market share and customers, and restrict output. *Id.* ¶ 138. The Direct Complaint alleges that:

> The agreements encompassed not only prices charged to third party customers, but, in the case of vertically integrated manufacturers who produced both CRTs and CRT Products, also encompassed: (a) prices charged by the CRT manufacturing arm of each such integrated company to the corporate division or subsidiary that manufactured or sold computer monitors, television or other similar products and (b) price floors on quotations offered by the competitors of the integrated company to such a division or subsidiary. Defendants also considered the internal pricing of products containing CRTs in agreeing upon the prices at which CRTs were set.

*Id.* ¶ 144.

The Direct Complaint contains allegations supporting the economic plausibility of the alleged conspiracy. *See, e.g., id.* ¶¶ 112–21 (describing market concentration and joint ventures among Defendants), ¶¶ 188–97 (describing stable and increasing prices for CRT Products despite factors that should have caused price declines, such as emergence of flat panel technology).

The Indirect Complaint contains similar allegations. *See, e.g.,* Indirect Compl., ¶¶ 121–39 (describing structural characteristics of CRT Product market, including barriers to entry, and how the market conducive to collusive activity), ¶¶ 140–88 (allegations of group and bilateral meetings, "Glass Meetings," and meetings on golf courses, some of which were attended by high-level company executives), ¶¶ 189–

202 (allegations of unnatural and sustained price stability or unusual upward price movement in the CRT Product market). The Indirect Purchaser Plaintiffs allege that Defendants:

> agreed on the prices at which certain Defendants would sell CRTs to their own corporate subsidiaries and affiliates that manufactured end products, such as televisions and computer monitors.... Defendants ... concluded that in order to make their CRT price increases stick, they needed to make the increase high enough that their direct customers (CRT TV and monitor makers) would be able to justify a corresponding price increase to their customers. In this way, Defendants ensured that price increases for CRTs were passed on to indirect purchasers of CRT Products.

*Id.* ¶¶ 154–55. The Indirect Purchaser Plaintiffs allege that manufacturers where raising the price of monitors in 2004. *Id.* ¶ 197.

Many of Defendants' objections rely on *Kendall v. Visa U.S.A. Inc.,* 518 F.3d 1042 (9th Cir.2008). The case is distinguishable. The Ninth Circuit panel affirmed the district court's dismissal of an antitrust action where, after conducting discovery, plaintiffs were unable to amend their complaint to plead evidentiary facts showing banks entered into agreements to restrain trade. *Id.* at 1048. Here, the complaints allege a governmental investigation, hundreds of meetings between 1995 and 2007, and detailed allegations concerning the structure and typical pattern of those meetings.

For the most part, Defendants' objections re-hash arguments that have been considered and rejected by courts in this district *See, e.g., In re Flash Memory Antitrust Litig.,* 643 F.Supp.2d 1133, 1142, 1150 (N.D.Cal.2009) (finding direct and indirect purchasers' allegations sufficient to

state antitrust claims against manufacturers, sellers and distributors of flash memory); *In re TFT–LCD (Flat Panel) Antitrust Litig.*, 599 F.Supp.2d 1179, 1184–85 (N.D.Cal.2009) (finding direct and indirect purchasers' allegations sufficient to state antitrust claims against manufacturers, distributors, and sellers of thin film transistor liquid crystal display panels and products).

Indeed, the complaints here are very similar to the complaints Judge Illston considered in *In re TFT–LCD (Flat Panel) Antitrust Litigation.* In that case, the complaints alleged numerous conspiratorial communications, governmental investigations, specific information concerning the structure and content of meetings, allegations that the conspiracy was organized at the highest level of the defendant organizations, and allegations that it was implemented by related companies within a corporate family. *Id.* at 1184. Here, as outlined above, the complaints contain similar factual allegations. Drawing on its judicial experience, this Court concludes the allegations contained in the Direct Complaint and the Indirect Complaint meet the pleading standards articulated by the Supreme Court in *Twombly* and *Iqbal.*

### D. Objections Based on Failure to Adequately Plead Against Each Defendant

██ The Special Master recommends that the complaints should not be dismissed based on a failure to adequately plead against each defendant. Report at 11–16. Courts in this district do not require plaintiffs in complex, multinational, antitrust cases to plead detailed, defendant-by-defendant allegations; instead they require plaintiffs "to make allegations that plausibly suggest that each Defendant participated in the alleged conspiracy." *In re TFT–LCD (Flat Panel) Antitrust Litig.*, 599 F.Supp.2d at 1185 (quoting *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 580 F.Supp.2d 896, 904 (N.D.Cal.2008)). In complex, multinational, conspiracy cases, courts in this district review specific allegations in the context of the complaint taken as a whole. *In re Flash Memory Antitrust Litig.*, 643 F.Supp.2d at 1144, 1147, 1148; *In re TFT–LCD (Flat Panel) Antitrust Litig.*, 599 F.Supp.2d at 1185. Although not a pleading standards case, this approach is consistent with the Supreme Court's admonition in *Continental Ore Company v. Union Carbide and Carbon Corporation* that the "character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole." 370 U.S. 690, 699, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962).

██ Having reviewed the complaints as a whole, the Court determines that the factual allegations plausibly suggest that each Defendant participated in the alleged conspiracy. As well as the factual allegations described above, *see* Part IV(B–C), *supra*, both complaints contain allegations concerning specific Defendants' participation in the alleged unlawful meetings and agreements. Direct Compl. ¶¶ 154–75; Indirect Compl. ¶¶ 166–88. Although Plaintiffs often refer to a corporate family by a single name, they allege that employees engaged in conspiratorial meetings on behalf of members of their corporate families, that participants did not always know the corporate affiliation of their counterparts and did not distinguish between the entities within a corporate family, and that participants "entered into agreements on behalf of, and reported these meetings and discussions to, their respective corporate families. As a result, the entire corporate family was represented in meetings and discussions by their agents and was a party to the agreements reached in them." Direct Compl. ¶ 154; Indirect Compl. ¶ 188.

Samsung Electronic Co., Ltd. ("SEC") and Samsung Electronics America, Inc. ("SEAI") object based on the fact that they do not manufacture CRTs; instead, they sell finished products. See Docket Nos. 616 ("Samsung Objections re: Direct Complaint"), 617 ("Samsung Objections re: Indirect Complaint"). However, both complaints describe the relationship between the Samsung Defendants. Direct Compl. ¶¶ 58–66; Indirect Compl. ¶¶ 62–71. It is alleged that SEC dominated and controlled the finances, policies, and affairs of SEAI, and the other Samsung SDI entities, relating to the alleged antitrust violations. *Id.*

Both complaints allege that "Samsung, through SEC, Samsung SDI, Samsung Malaysia, Samsung SDI Shenzhen, and Samsung SD Tianjin" participated in hundreds of meetings between 1995 and 2006 where agreements were made regarding price, output restrictions, and customer and market allocation of CRT Products. Direct Compl. ¶ 166; Indirect Compl. ¶ 166. The complaints allege that SEAI was represented at the meetings, and that it wished to ensure that the prices paid for CRT products did not undercut the CRT pricing agreements reached at the meetings. Direct Compl. ¶ 167; Indirect Compl. ¶ 167. SEC acknowledges that it has a financial stake in Samsung SDI, a company that sells CRTs. See Samsung Objections re: Direct Complaint at 1. Indeed, Samsung SDI is alleged to have controlled twenty-four per cent of the CRT market in 2002. Direct Compl. ¶ 112. It is economically plausible that affiliated companies would wish to see any price increases in CRTs passed through to the purchasers of CRT Products.

Panasonic Corporation of North America ("PNA") and Panasonic Corporation ("Panasonic Corp.") also object based on the fact that they sell finished products. *See* Docket Nos. 605 ("Panasonic Objec-

tions re: Direct Complaint"), 608 ("Panasonic Objections re: Indirect Complaint"). However, it is alleged that Panasonic Corp., a Japanese company, dominated and controlled the finances, policies and affairs of the other Panasonic entities relating to the alleged antitrust violations. Direct Compl. ¶¶ 46–50, Indirect Compl. ¶¶ 80–86.

The Direct Purchaser Plaintiffs allege that "Panasonic, directly or through Matsushita Malaysia, participated in several dozen bilateral and group meetings from 1996 through at least 2003 in which unlawful agreements as to ... price, output restrictions, and customer and market allocation of CRT Products occurred." Direct Compl. ¶ 162. The Indirect Purchaser Plaintiffs allege that between 1996 and 2003, Panasonic Corp. participated in several Glass Meetings. Indirect Compl. ¶ 181. They allege that after 2003, Panasonic participated through its joint venture with Toshiba, MT Picture Display Co., Ltd. ("MTPD"). *Id.* High-level sales managers from Panasonic and MTPD allegedly participated. *Id.* Indeed, MTPD is alleged to have led many of the Glass Meetings. *Id.* ¶ 183. It is alleged that Panasonic engaged in bilateral meetings with other Defendants, and that during these meetings, agreements were reached regarding prices and supply levels for CRT Products. *Id.* ¶ 181. Both complaints allege that PNA wished to ensure prices paid by purchasers of CRT products would not undercut the pricing agreements reached at the Glass Meetings. Direct Compl. ¶ 163; Indirect Compl. ¶ 182. Such allegations make economic sense to the Court, especially given that MTPD was engaged in the manufacture of CRTs, and is a Panasonic-related entity. *See* Panasonic Objections re: Direct Complaint at 2 n. 1.

For similar reasons, the Court finds that the allegations in the Direct Complaint and

the Indirect Complaint are sufficient to state a claim as to each of the Toshiba, LG Electronics, Hitachi, and Philips entities. Both complaints describe the relationships between the Toshiba entities, and it is alleged that Toshiba Corporation dominated and controlled the other Toshiba entities in relation to the alleged antitrust violations. Direct Compl. ¶¶ 71–78; Indirect Compl. ¶¶ 72–78. Representatives of the Toshiba entities are alleged to have participated in over fifty bilateral and group meetings between 1995 and 2003. Direct Compl. ¶ 171; Indirect Compl. ¶ 177. The Indirect Purchaser Plaintiffs allege that Toshiba had a technology transfer agreement in 1995 with Chunghwa, the company whose CEO was indicted by the Department of Justice. Indirect Compl. ¶ 128(g). The Indirect Complaint quotes from Toshiba's 2008 Annual Report, which states that the group was being investigated by the European Commission and/or the U.S. Department of Justice for violations of competition laws with respect to CRTs. *Id.* ¶ 212. The Indirect Complaint alleges that Toshiba and Panasonic formed MTPD in 2002 in order to consolidate their CRT manufacturing facilities and limit production of CRTs. Indirect Compl. ¶¶ 72, 80, 125, 177, 198. Taken together with the other allegations in the complaints, and the allegations that participants in meetings entered into agreements on behalf of their corporate families, these factual allegations plausibly suggest that each Toshiba Defendant participated in the alleged conspiracy.

Both complaints describe the relationships between the LG Electronics entities. Direct Compl. ¶¶ 41–45; Indirect Compl. ¶¶ 50–53. LG Electronics, Inc. is alleged to have dominated and controlled the finances, policies, and affairs of LG Electronics USA, Inc., and LG Electronics Taiwan Taipei Co., Ltd., in relation to the alleged violations. Direct Compl. ¶¶ 42, 43; Indirect Compl. ¶¶ 51, 52. The LG Electronics Defendants are alleged to have participated in a dozen bilateral meetings and over a hundred group meetings between 1995 and 2006. Direct Compl. ¶¶ 160, 175. To the extent that LG Electronics USA, Inc. distributed products in the United States, the complaints allege it wished to ensure prices for products would not undercut pricing agreements regarding CRTs. Direct Compl. ¶ 161. There are also allegations that the LG Electronics entities participated in meetings at trade associations and trade events that were used to further the conspiracy. Direct Compl. ¶¶ 176–80.

Both complaints describe the relationships between the Hitachi entities. Direct Compl. ¶¶ 30–36; Indirect Compl. ¶¶ 87–93. The complaints allege that Hitachi, Ltd., a Japanese company, dominated and controlled the finances, policies, and affairs of Hitachi America, Ltd., Hitachi Asia, Ltd., Hitachi Displays, Ltd., and Hitachi Electronic Devices (USA), Inc., relating to the antitrust violations alleged. *Id.* The Direct Purchaser Plaintiffs allege that the Hitachi entities participated in over a dozen illegal bilateral and group meetings from 1996 through at least 2001. Direct Compl. ¶ 157. They allege that Hitachi America, Ltd., and Hitachi Electronic Devices (USA), Inc. were represented at the meetings and were parties to the agreements entered at them. *Id.* ¶ 158. They allege that these distributors of CRT Products wished to ensure the prices paid by consumers did not undercut the pricing agreements regarding CRTs. *Id.* The Indirect Purchaser Plaintiffs allege that the Hitachi entities participated in several Glass Meetings, and that the meetings were attended by high-level sales managers from Hitachi. Indirect Compl. ¶ 179.

Both complaints describe the relationships between the Philips entities. Direct Compl. ¶¶ 51–56; Indirect Compl. ¶¶ 54–

60. The complaints allege that Koninklijke Philips Electronics N.V. ("Royal Philips"), a Dutch entity, dominated and controlled the finances, policies, and affairs of Philips Electronics North America Corporation, Philips Electronics Industries (Taiwan), Ltd., and Philips da Amazonia Industria Electronica Ltda., relating to the antitrust violations alleged. *Id.* The Direct Purchaser Plaintiffs allege that the Philips entities participated in over 100 illegal meetings from 1996 to 2007. Direct Compl. ¶¶ 164–65. The Indirect Purchaser Plaintiffs allege that the Philips entities participated in at least 100 Glass Meetings between 1996 and 2001, and that after 2001, they participated through a joint venture with LG Electronics. Indirect Compl. ¶ 170.

Beijing Matsushita Color CRT Co., Ltd.("BMCC"), is alleged to have participated in over twenty illegal bilateral meetings. Direct Compl. ¶¶ 80, 173. The Indirect Purchaser Plaintiffs allege that high-level sales managers from BMCC participated in multiple Glass Meetings. Indirect Compl. ¶¶ 2, 148, 184. BMCC objects based on the fact that it makes CRTs only. *See* Docket No. 618 ("BMCC Objections re: Direct Compl.") at 3, No. 619 ("BMCC Objections re: Indirect Compl.") at 1. BMCC is the only Defendant to object on this basis, but it is clear to the Court that the complaints do allege sufficient facts to state a plausible conspiracy regarding CRTs, especially given the Department of Justice investigation. *See* Part IV(C), *supra.* The Court therefore overrules this objection, and also grants Plaintiffs' request to amend paragraph 173 of the Direct Complaint, with respect to the allegations against BMCC, to change the year "2001" to "2007."

Whether Plaintiffs will be able to prove these allegations against each Defendant is another matter entirely. In general, Defendants' arguments for dismissal based on a failure to adequately plead against each Defendant rely upon arguments more appropriate at the summary-judgment stage of these proceedings when Defendants can put Plaintiffs to their burden of proof. Taken as a whole, the Court finds that both the Direct Complaint and the Indirect Complaint plausibly suggest that each Defendant participated in the alleged conspiracies. Therefore, it would be inappropriate to dismiss any of the Defendants from this action without the benefit of discovery.

### E. *Subject Matter Jurisdiction*

■ The Special Master recommends that the complaints should not be dismissed for lack of subject matter jurisdiction under the Foreign Trade Antitrust Improvements Act ("FTAIA"). Report at 16–18. The FTAIA provides that the Sherman Act does not apply to conspiracies involving trade or commerce with foreign nations, unless such conduct has direct, substantial, and reasonably foreseeable effects on United States commerce. 15 U.S.C. § 6a.

The Court agrees with Judge Legge that these complaints should not be dismissed based on the FTAIA. When announcing the indictment of C.Y. Lin, the Acting Assistant Attorney General suggested the alleged CRT conspiracy does have effects in the United States: "This conspiracy harmed countless Americans who purchased computers and televisions using cathode ray tubes at fixed prices." Direct Compl. ¶ 126; Indirect Compl. ¶ 205.

The Direct Complaint alleges that Defendants manufactured, sold, or distributed CRT products throughout the United States, either directly or through subsidiaries or affiliated companies. Direct Compl. ¶¶ 24–80. The Direct Complaint alleges plant closures in New York, Ohio, and Indiana in furtherance of the claimed

conspiracy to reduce manufacturing capacity of CRTs. *Id.* ¶¶ 183, 185, 187. The Direct Complaint alleges adverse price effects in the United States due to Defendants' unlawful activities. *Id.* ¶¶ 188–89.

Similarly, the Indirect Purchaser Plaintiffs have alleged a conspiracy encompassing both CRTs and CRT Products that was carried out both in the United States, and abroad, which involved a substantial amount of import and domestic commerce, and which targeted and injured American consumers. *See, e.g.,* Indirect Compl. ¶¶ 1, 9, 10, 11, 12, 50–52, 54–59, 61–70, 72–78, 80–83, 85–92, 94–95, 97–98, 100–02, 104–08, 114–16, 162, 167, 169, 171, 174, 176, 178, 180, 182, 188, 240, 242, 246, 248–50, 255–71 and 274–283. At this stage of the proceedings, these allegations are sufficient to withstand motions to dismiss for lack of subject matter jurisdiction.

### F. *Antitrust Standing*

 The Special Master recommends denial of the motions to dismiss based on Plaintiffs' supposed lack of standing. In deciding whether there is antitrust standing, courts consider: (1) the nature of the plaintiff's alleged injury; that is, whether it was the type the antitrust laws were intended to forestall; (2) the directness of the injury; (3) the speculative measure of the harm; (4) the risk of duplicative recovery; and (5) the complexity in apportioning damages. *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters,* 459 U.S. 519, 535–44, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983) ("AGC"). No single factor is decisive; courts are to balance the factors, giving "great weight to the nature of the plaintiff's alleged injury." *American Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.,* 190 F.3d 1051, 1055 (9th Cir.1999).

Here, the Direct Purchaser Plaintiffs allege they purchased CRTs or CRT Products from Defendants or their subsidiaries at inflated prices due to Defendants' un-

lawful conduct. Direct Compl. ¶¶ 11–23. This is the type of injury the antitrust laws were intended to address. Furthermore, courts have found antitrust standing where plaintiffs purchased downstream goods from manufacturers who made, and allegedly fixed the price of, a component of those goods. *See, e.g., In re Linerboard Antitrust Litig.,* 305 F.3d 145, 159–60 (3d Cir.2002) (in alleged conspiracy to fix prices of linerboard, plaintiffs who purchased corrugated sheets or boxes containing linerboard from defendants had standing).

 In *Illinois Brick Company v. Illinois,* the Supreme Court held that indirect purchasers generally may not sue for money damages under Section 4 of the Clayton Act. 431 U.S. 720, 730, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977). In response, a number of states passed "repealer" statutes which expressly allow indirect purchasers to recover money damages for antitrust violations under state law. *See California v. ARC Am. Corp.,* 490 U.S. 93, 97–98, 109 S.Ct. 1661, 104 L.Ed.2d 86 (1989). In the present case, the Indirect Purchaser Plaintiffs' second claim for relief for state antitrust violations is predicated on the repealer statutes of Arizona, California, Iowa, Kansas, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Mexico, North Carolina, North Dakota, South Dakota, Tennessee, Vermont, West Virginia, Wisconsin. Indirect Compl. ¶¶ 255–71. The AGC factors apply to establish standing under Iowa, Nebraska, and California antitrust laws. *In re Flash Memory Antitrust Litigation,* 643 F.Supp.2d at 1151.

Defendants argue that the Indirect Purchaser Plaintiffs have not alleged that they participate in the same market as Defendants, and as such, their alleged injury is too remote, speculative, unmanageably complex, or duplicative. Docket No. 614 ("Joint Objections re: Indirect Compl.") at

12–13. However, the Indirect Complaint alleges that Plaintiffs paid "higher prices for CRT Products than they would have paid in the absence of Defendants' conspiracy." Indirect Compl. ¶ 222. It alleges that the "price of CRT Products is directly correlated to the price of CRTs." *Id.* ¶ 226. It alleges that the "market for CRTs and the market for CRT Products are ... inextricably linked and cannot be considered separately." *Id.* ¶ 227. Indirect Purchaser Plaintiffs allege that Defendants monitored the prices of televisions and computer monitors in order to police their price fixing agreement related to CRTs. *Id.* ¶ 223. They point out that CRTs account for approximately sixty per cent of the cost of manufacturing a computer monitor, and a slightly smaller percentage of the cost of manufacturing a television, and as such it is easier to determine how much money was being passed through to purchasers of the finished products. *Id.* ¶ 228–30. CRTs are discrete components that can easily be traced. *Id.* ¶ 231. These allegations are sufficient to find the injury alleged in the Indirect Complaint is the kind antitrust laws were designed to rectify.

The Court also agrees with the Special Master that Plaintiffs have adequately pled standing to seek injunctive relief under Section 16 of the Clayton Act. *See* Report at 19; *see also In re Warfarin Sodium Antitrust Litig.*, 214 F.3d 395, 399 (3d Cir.2000) ("[I]njunctive relief under section 16 only requires a threat of loss" and section 16 is not as demanding as section 4 of Clayton Act).

### G. *Allegations of Fraudulent Concealment*

■ The Special Master recommends that the motions to dismiss claims accruing more than four years before the complaints were filed should be denied. Report at 19–24. The Special Master also recommends that the challenges to the sufficiency of the fraudulent concealment allegations should be denied. *Id.* The Court agrees with the Special Master's recommendations.

■ The Court notes that "it is generally inappropriate to resolve the fact-intensive allegations of fraudulent concealment at the motion to dismiss stage, particularly when the proof relating to the extent of the fraudulent concealment is alleged to be largely in the hands of the alleged conspirators." *In re Rubber Chemicals Antitrust Litig.*, 504 F.Supp.2d 777, 789 (N.D.Cal. 2007). The Court further notes that Defendants' reliance on *Barker v. American Mobil Power Corp.*, 64 F.3d 1397 (9th Cir. 1995) is misplaced. In that case, the Ninth Circuit panel was reviewing an order on motions for summary judgment. *Id.* at 1400. After an opportunity for discovery, plaintiffs were unable to produce specific evidence of fraudulent activity or concealment on the part of two of the defendants. *Id.* at 1401. Here, on the other hand, discovery is in its early stages, and motions for summary judgment have not been filed.

The Direct Complaint contains allegations of fraudulent concealment. Direct Purchaser Plaintiffs allege that Defendants gave pretextual reasons for price increases, and coordinated their misleading announcements. Direct Compl. ¶¶ 148, 153, 206. Direct Purchaser Plaintiffs allege Defendants took steps to keep their meetings secret, such as varying meeting locations, limiting meeting attendees, avoiding note-taking, and agreeing to maintain the secrecy of meetings. *Id.* ¶¶ 137, 138, 154, 201, 204, 205. Plaintiffs allege that CRT manufacturers, including companies affiliated with Samsung, Philips, and LG Electronics, blamed price increases in 2004 on a shortage of glass shells. *Id.* ¶ 209.

The Indirect Complaint also contains allegations of fraudulent concealment. Indirect Purchaser Plaintiffs allege that the agreements reached at Glass meetings included agreements to keep their meetings secret. Indirect Compl. ¶ 156(*l* ). Indirect Purchaser Plaintiffs allege Defendants agreed: "not to discuss publicly, or otherwise reveal, the nature and substance" of their dealings, and "to expel those who failed to do so"; "to limit the number of representatives from each Defendant attending their meetings so as to avoid detection"; "to refrain from listing the individual representatives of the Defendants in attendance at meeting in any meeting report"; "to refrain from taking meeting minutes or taking any kind of written notes during the meetings"; and to give "false and pretextual reasons for CRT Product price increases." Indirect Compl. ¶ 290. Defendants also allegedly agreed "on what to tell customers about price changes"; agreed "upon the content of public statements regarding capacity and supply"; and agreed "to eliminate references in expense reports that might reveal the existence of their unlawful meetings." *Id.* When viewed in conjunction with the Court's earlier determination that the factual allegations in the complaints plausibly suggest that each Defendant participated in the conspiracy, these allegations of fraudulent concealment are sufficient to deny Defendants' efforts to dismiss claims that accrued before Nov. 26, 2003, based on the four-year statute of limitations.[2]

### H. *Withdrawal Claims*

■ With regard to those Defendants who moved to dismiss based on claims that they withdrew from the alleged conspiracy in 2001 or 2002, the Court agrees with the Special Master that this issue raises factual questions inappropriate for resolution at the motion-to-dismiss stage. *See* Report at 25. For example, how can the Court know at this stage of the proceedings whether the withdrawing Defendants maintained financial interests in the entities being sold or transferred? It would have been inappropriate for the Special Master to grant the motions to dismiss filed by the Philips Defendants, the Toshiba Defendants, the Hitachi Defendants, the LG Electronics Defendants, and BMCC, on these grounds.

### I. *State Law Claims*

The Special Master recommends that a number of the state law claims in the Indirect Complaint should be dismissed. Report at 27–31. The Indirect Purchaser Plaintiffs do not object to these rulings against them. Docket No. 641 ("Response to Joint Objections") at 1. The Court therefore adopts the recommendation of the Special Master, and DISMISSES the claims under Nebraska law based on sales made prior to July 20, 2002; the claims under Nevada law based on sales made prior to 1999; the claims under the Massachusetts Consumer Protection Act, with leave to amend; the claims under the Rhode Island Unfair Trade Practices and Consumer Protection Act; and the claims

**2.** The Court is concerned about the temporal scope of the alleged conspiracies in this case. As directed by the Court at the March 18, 2010 hearing, the parties met and conferred, but appear unable to reach a mutually acceptable proposal to present to the Court. *See* Docket Nos. 660, 661, and 662. The Court acknowledges that allegations of fraudulent concealment are fact-intensive. The Court encourages the parties to work with the Special Master on ways to streamline and efficiently manage discovery in this case. After discovery, the Court invites the parties to consider whether motions should be filed to determine the statute of limitations, or whether the matter should be left as a question for the jury.

made under Kansas' common law of unjust enrichment.

The Special Master also recommends that a number of the state law claims should not be dismissed. Report at 30–33. Defendants' objections contains no specific discussion of these recommendations. Accordingly, the Court adopts the Special Master's recommendations, and DENIES the motions to dismiss Plaintiffs' claims under New York General Business Law Section 349; the claims under Michigan common law of unjust enrichment; the claims of unjust enrichment under New York common law; and the unjust enrichment claims of several states based upon other statutes in those states.

## V. *CONCLUSION*

For the foregoing reasons, the Court APPROVES and ADOPTS the Special Master's tentative rulings and recommendations in the following particulars:

1. The Court finds that the relevant products alleged in the complaints are Cathode Ray Tubes ("CRTs") and CRT Products;

2. The Court DENIES Defendants' motions to dismiss based upon *Twombly* and *Iqbal*;

3. The Court DENIES Defendants' motions to dismiss based upon an alleged failure to adequately plead against "each defendant";

4. The Court DENIES Defendants' motions to dismiss based upon the Foreign Trade Antitrust Improvements Act, the Supremacy Clause, and the Commerce Clause;

5. The Court DENIES Defendants' motion to dismiss based upon Plaintiffs' alleged lack of standing;

6. The Court FINDS that the allegations of the direct and indirect complaints regarding fraudulent concealment are adequate to toll the statutes of limitations;

7. The Court DENIES Defendants' motions to dismiss both the direct and indirect complaints on the grounds of the statutes of limitations;

8. The Court GRANTS Plaintiffs' motion to amend paragraph 173 of the Direct Complaint, with respect to the allegations against BMCC to change the year "2001" to "2007";

9. The Court DENIES the motions of several Defendants for dismissal based on their alleged withdrawal from the conspiracy;

10. The Court DISMISSES the claims under Nebraska law based on sales made prior to July 20, 2002;

11. The Court DISMISSES the claims under Nevada law based on sales made prior to the 1999 date of Nevada's repealer statute;

12. The Court DISMISSES the claims under the Massachusetts Consumer Protection Act, with leave to amend;

13. The Court DENIES the motions to dismiss Plaintiffs' claims under New York General Business Law Section 349;

14. The Court DISMISSES the allegations under the Rhode Island Unfair Trade Practices and Consumer Protection Act;

15. The Court DENIES the motion to dismiss the claims under Michigan common law of unjust enrichment;

16. The Court DISMISSES the claims under the Kansas' common law of unjust enrichment;

17. The Court DENIES Defendants' motion to dismiss the claims of unjust enrichment under New York common law;

18. The Court DENIES, without prejudice, Defendants' motions to dismiss the unjust enrichment claims of several states based upon other statutes in those states;

19. The Court requires Defendants to file answers within thirty (30) days from the date of this Order;

20. The Court respectfully directs the Special Master to set a date for a Case Management Conference to schedule further proceedings in this case.

IT IS SO ORDERED.